**UNITED STATES of America, Appellant,**

v.

**Lennard L. MEAD et al., Appellees.**

**No. 22180.**

United States Court of Appeals, Ninth Circuit.

March 24, 1970.

Leonard Schaitman (argued), Alan S. Rosenthal, Howard J. Kanshner, Attys., Dept. of Justice, Washington, D. C., Larry L. Dier, Asst. U. S. Atty., Wm. Matthew Byrne, Jr., U. S. Atty., Los Angeles, Cal., for appellant.

David Kinley (argued), Wm. L. Callender, Oxnard, Cal., Wm. L. Boyes, Camarillo, Cal., Paul B. Noel, Thousand Oaks, Cal., Carl A. Stutsman, Jr., of Hill, Farrer & Burrill, Los Angeles, Cal., for appellees.

Before CHAMBERS and JERTBERG, Circuit Judges, and WEIGEL,* District Judge.

CHAMBERS, Circuit Judge.

Lennard Mead and the other appellees are in trouble over a series of government payments for "farmer's conservation practices." These payments were pursuant to a Department of Agriculture conservation program developed under the authority of the Soil Conservation and Domestic Allotment Act, 16 U. S.C. §§ 590a–590q. Mead was a farmer-contractor who constructed conservation practices on the farms of his mother (Violet) and the other appellees.

The basic concept of the Agricultural Conservation Program was that the federal government was to assist farmers and ranchers in carrying out approved conservation practices. The Program authorized the government to pay to or for each farmer the lesser of a fixed percentage of the cost price of dirt ditches or dams or a fixed price per unit of work performed (here, price per cubic yard of earth moved). In no event was the payment to exceed a fixed amount for the account of each farmer in a single program year.

The mechanics of the Program allowed government payments to be made directly to the contractor who did the work. Here Mead made out claims for payment with his invoices attached showing "prices" higher than the cash price to the farmers. Appellees submit and the district court found that in no instance was the claimed cost of a project higher than its actual or fair market value. The payments were all made by the government to Mead but the farmers signed the claims (in one case it was a foreman). In some cases the farmers paid some cash (but not the fixed percentage of the claimed cost of the project which the farmer was to bear). In others they furnished services to Mead or gave him pasture.[1]

---

* The Honorable Stanley A. Weigel, United States District Judge for the Northern District of California, sitting by designation.

1. The contributions of each appellee in cash, materials, or services were apparently as follows:

Richard Quine: Quine paid Mead $500 in cash and did not contribute any property or services to the projects.

Alden Johnson: Johnson paid Mead $317.40 and did not contribute any property or services to the projects.

Violet Mead: Mrs. Mead made no payments of any kind to her son.

Ray Sence: Sence paid Mead $172.41 in cash and also paid $627.59 for pipe used in the project.

Albert Chunn: Chunn contributed materials and services to the project. The

Now Mead and the farmers are faced with a complaint for statutory double damages and penalties under the False Claims Act, 31 U.S.C. §§ 231–233. Also, the government pleaded payment by mistake as an alternative theory of recovery. The trial court ruled with the defendants and the government appeals. As to false claims, we affirm and as to mistake, we reverse and remand.

■ Here the defense was largely that the prices shown the government were the "true value" and thus were not false. A second defense was that the government had not shown intent to defraud the government. The government would have us recede from our statement in United States v. National Wholesalers, 9th Cir., 236 F.2d 944, cert. den., 353 U. S. 930, 77 S.Ct. 719, 1 L.Ed.2d 724. But we adhere to our position that an actual intent to deceive must be proved. We cannot believe that the Congress intended to catch the hapless with the heavy penalties which may be imposed under the False Claims Act. Here is a contractor-farmer (Mead) who appears clumsy rather than venal. And, all the claims in controversy here were handled with the greatest informality. There was some signing in blank and generally the claims were partially prepared by the agents of the Department of Agriculture. It is a far different situation from that in National Wholesalers where it would be difficult to find a more callous presentation of claims. Here, on the evidence on false claims, the trial court could have found in favor of the government, but it did not have to do so. And, it did not.

As to the mistake theory on which we reverse and remand, we would summarize that in all or part of the payments the government was misled as to

the correct calculation of its authorized share of the cost.

Having summarized our conclusions, we go into some detail. We do this as to false claims because of the attack on National Wholesalers and we do it as to mistake because we reverse.

## I. THE FALSE CLAIMS ACT THEORY

### A. WERE THE CLAIMS FALSE?

The government argues that the claims were false because Mead's invoices overstated his actual charges to the applicant farmers and ranchers. Mead's position was that he regarded the terms cost and value as being synonymous and that his statements of the cost of the projects were not in excess of the actual or fair value of the projects. He billed the government for its share in an amount which he regarded as the "true cost figure" and, in contrast, merely accepted all he could get from the farmers. The evidence showed that in some instances, Mead prepared duplicate invoices. He sent an invoice to the government which stated his estimation of the value of the project. His invoices to the farmers allowed them cash discounts and thus stated amounts which were substantially smaller than their share of the "actual value" of the project as it was submitted in the invoice to the government.

Whether the claims were false depends upon the interpretation of the regulations and forms established by the Department of Agriculture in order to carry out its conservation program. Since judicial construction of the applicable regulations and forms is lacking, resort must be had to their language and apparent purpose. The applicable regulations for 1959 appear in 23 Federal Register sections 1101.1001(a), 1101.-

---

amount and value of his contributions is in dispute. Chunn contributed a tractor which he operated himself and a sprinkler system. Mead admitted at the trial that he could not really price Chunn's work. Chunn also granted Mead grazing rights of undetermined value.

A. V. Hohn: Hohn testified that he gave Mead three sheep worth $20 each, a trailer worth approximately $1,000, and approximately $640 worth of grazing rights. He also contributed the use of equipment and some labor during 1957–59.

1011(a), 1101.1027(b). During the other two years in question (1957–58) the regulations were the same as in 1959. These regulations refer to *"cost* sharing \* \* \* to achieve the maximum conservation benefits," "maximum federal cost-share," and *"cost* of the material or service." The regulations specify that the farmer or rancher will make a substantial contribution to the project. "The farmer or rancher will pay that part of the cost of the material or service \* \* \* which is in excess of the Federal *cost-share attributable to the use of the material or service."* (Emphasis added).

A number of Agricultural Conservation Program (ACP) forms are involved in this case. Form ACP 201 is captioned REQUEST FOR ACP COST-SHARING. This form requires the farmer's signature and contains an explicit request for cost-sharing. Form ACP 247 refers to "the extent which the federal government will share in the cost of performing the practice." Form ACP 245 requires the farmer to answer the following inquiry:

> "Did any other person including a State or Federal agency bear any part of the expense such as labor, equipment, seed or fertilizer, or *otherwise bear any part of the expense of carrying out this practice?* Yes or no. (Emphasis added).

This form seems designed to allow the government to compute its share taking into account the amount which the farmer himself has actually contributed to the project.

■ The district judge in his findings of fact concluded that the claims were not false because they were based on the undisputed fair market value of the completed projects and the United States had not made payments on the claims in excess of the fair market value of the United States' agreed share of the project. Based on our construction of the applicable regulations and forms, we conclude that fair market value or actual value is not the correct measure of the cost of the projects. Thus, Mead's figures which he submitted as the cost of the projects were erroneous. An additional consideration is that cost is a concept clearly distinguishable from value. City Ice Delivery Co. v. United States, 4th Cir., 176 F.2d 347.

The Agricultural Conservation Program of 1957–59 was intended to encourage farmers and ranchers to take conservation measures they ordinarily would not take by having the federal government share part of the cost. The government did not undertake to make a gift of conservation projects but rather to make a contribution to the cost of the project. A practical consideration is that the cost of constructing a conservation project is more readily ascertained than is the elusive concept of value of a project. This program was designed to assist the farmer in paying for his own project, not to have the farmer contribute what he can to a federal project.

B. SPECIFIC INTENT TO DEFRAUD AND KNOWLEDGE OF FALSITY

■ The Ninth Circuit has adopted the rule that to recover under the False Claims Act, the government must prove that the defendant had the specific intent of deceit. In United States v. National Wholesalers, 9th Cir., 236 F.2d 944, cert. den. 353 U.S. 930, 77 S.Ct. 719, 1 L.Ed.2d 724, recovery was sought against a successful bidder for a government contract who delivered spuriously labeled voltage regulators to the Army. In applying the Act, this Court stated the requirement that "undoubtedly there must be the intent to work a deceit on the government." 236 F.2d at 950. The government urges that the False Claims Act dispenses with the specific intent to defraud requirement in all but two categories of conduct which are not involved here.[2] However, the government's posi-

---

2. Cases which are in accord with National Wholesaler's intent requirement include:

United States v. Priola, 5th Cir., 272 F.2d 589, 594; United States v. Ueber,

tion rests upon a shaky foundation of semantic distinctions. The juxtaposition of the three adjectives, "false, fictitious, or fraudulent" probably resulted from a draftsman's desire to encompass the varying ways in which fraud is defined. Judicial definition of fraud indicates that there is not an accepted distinction between a knowingly false claim and a fraudulent claim. United States v. Interstate Engineering Corp., D.N.H., 288 F.Supp. 402; Travelers Indemnity Co. v. Harris, E.D.Mo., 216 F.Supp. 420.[3] No reason is apparent why only two of the six types of conduct proscribed in the False Claims Act should require the element of specific intent to defraud. Since no reason appears for a partial elimination of the intent requirement, we are unwilling to find a Congressional intent to make such a distinction by subtle means. A further consideration is the familiar principle of construction that no statute is to be construed as altering the common law further than its words import.[4] Intent to defraud has always been an essential element of common law fraud[5] and Congressional intent to partially dispense with that element in the False Claims Act is lacking.

■ The district judge did not make any findings concerning the appellees' intent since he found that the claims were not false. Although, as previously discussed, the claims were technically in-

correct and thus false within the meaning of the False Claims Act, our reading of the record is that the government failed to clearly show that the appellees knew that the claims were false or that they had a specific intent to deceive. Since the trial judge did not make findings on the issues of knowledge of falsity and intent to deceive, we would be required to remand the case for appropriate findings if the matter was subject to doubt. 5 MOORE, FEDERAL PRACTICE § 52.06 [2]. However, the record conclusively demonstrates that appellees' conduct was inconsistent with knowing presentation of false claims or intent to deceive the government.

■ The government had the burden of showing by clear explicit and unequivocal evidence that Mead had knowledge that the claims were false. Woodbury v. United States, D.Ore., 232 F. Supp. 49; Proctor v. Sagamore Big Game Club, 3d Cir., 265 F.2d 196. The district judge in his findings of fact concluded that the actual value of the work was no greater than Mead's valuation and that the payments were not shown to be in excess of the fair value of the United States' agreed share of the cost. The judge further found that the primary reason that Mead submitted discount invoices to particular landowners was for his use in avoiding charges of under-reporting his income for feder-

6th Cir., 299 F.2d 310, 315 (dicta); Woodbury v. United States, D.Ore., 232 F.Supp. 49; United States v. Schmidt, E.D.Wis., 204 F.Supp. 540, 543–544; United States v. Goldberg, E.D.Pa., 158 F.Supp. 544; United States v. Park Motors, E.D.Tenn., 107 F.Supp. 168. The opposing view is found in Fleming v. United States, 10th Cir., 336 F.2d 475, cert. den. 380 U.S. 907, 85 S.Ct. 889, 13 L.Ed.2d 795; Acme Process Equipment Co. v. United States, 347 F.2d 509, 527 n. 26, 171 Ct.Cl. 324, rev'd on other grounds, 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249; United States v. Fox Lake State Bank, N.D.Ill., 225 F.Supp. 723.

3. Knowing a claim to be false is equivalent or at least akin to wilfully submitting a false claim. Zebouni v. United States, 5th Cir., 226 F.2d 826, 828; United States

v. De Witt, 5th Cir., 265 F.2d 393, 403 (dissenting opinion). See Fleming v. United States, 10th Cir., 336 F.2d 475, 479, cert. den. 380 U.S. 907, 85 S.Ct. 889, 13 L.Ed.2d 795.

4. Shaw v. Railroad Co., 101 U.S. 557, 565, 25 L.Ed. 892. The False Claims Act is not in derogation of the common law but is merely another remedy which the government can invoke to protect itself from fraud. United States v. Borin, 5th Cir., 209 F.2d 145.

5. Magee v. Manhattan Life Ins. Co., 92 U.S. 93, 23 L.Ed. 699; Miller v. United States, 10th Cir., 120 F.2d 968, 970. If a change in the common law is to be effectuated, the legislative intent to do so must be clearly and plainly expressed. United States v. Bowman, 3d Cir., 358 F.2d 421.

al tax purposes. These findings are consistent with the view that Mead believed his claims were properly prepared. Mead's testimony was that he believed that the claims were correct and that he was entitled to as much as he received from the government. It is not surprising that Mead thought his claims were properly prepared. This is not a situation where the meaning of government regulations or forms has long been established. Even lawyers may have differed as to the proper interpretation of the forms. Mead's operating procedures are more likely attributable to his lack of experience or education in the fundamentals of good business practices rather than to a calculated plan to defraud the government. The remaining appellees had only incomplete knowledge of Mead's methods and intent. Thus their culpability is even less than that of Mead. In summary, the record falls short of proof of the elements necessary to liability under the False Claims Act.

## II. THE MISTAKE THEORY

The government's alternative theory of recovery is under the common law doctrine of payment by mistake. This remedy is available to the United States and is independent of statute. United States v. Wurts, 303 U.S. 414, 58 S.Ct. 637, 82 L.Ed. 932; United States v. Howell, 9th Cir., 318 F.2d 162; United States v. Borin, 5th Cir., 209 F.2d 145.

> "The Government by appropriate action can recover funds which its agents have wrongfully, erroneously or illegally paid. * * * The Government's right to recover funds from a person who received them by mistake and without right, is not barred unless Congress has 'clearly manifested its intention to raise a statutory barrier.' " Kingman Water Co. v. United States, 9th Cir., 253 F.2d 588, 590, quoting United States v. Wurts, 303 U.S. 414, 415–416, 58 S.Ct. 637, 82 L.Ed. 932.

The type of mistake which the government asserts is that it mistakenly assumed that it was sharing the cost of the conservation projects with the farmers rather than paying the entire cost (or substantially the entire cost).

If the government made these payments under an erroneous belief which was material to the decision to pay, it is entitled to recover the payments. United States v. Wurts, 303 U.S. 414, 58 S.Ct. 637; Rains v. United States, 312 F.2d 764, 160 Ct.Cl. 535; United States v. Goldberg, E.D.Penn., 158 F.Supp. 544; RESTATEMENT OF RESTITUTION §§ 6, 9, 26. As previously discussed, the government was mistaken in its belief that the appellees had complied with the applicable regulations which require that the claims must be based on actual cost to the farmer measured in terms of cash, enforceable promises, materials and services rendered rather than the "true value" of the completed project. Mead's forms and invoices were technically incorrect since they were based on value of the projects rather than cost. Consequently, the government was mistaken in its payments to the extent that the payments exceeded the established percentage of the cost of each project; cost being measured by the value given by each farmer in cash, enforceable promises, services, equipment and materials. The case must be remanded to allow the district court to make findings on the issues of number and amount of payments made by mistake.

As the one into whose hands the mistaken payments flowed, Mead is liable to the government for each of the mistaken over-payments. Since Mead was the active force in obtaining the payments and directly received the benefits of the payments, he now must return that portion of the total of the payments which was made by mistake. The other appellees are liable for the mistaken payments because they signed the aid applications and because Mead purported to act in their behalf and they received benefits as a result of the transaction. Wisconsin Central Railroad Co. v. Unit-

ed States, 164 U.S. 190, 17 S.Ct. 45, 41 L.Ed. 399; United States v. City of Philadelphia, E.D.Penn., 50 F.Supp. 170; *See* RESTATEMENT (SECOND) OF AGENCY Sections 104, 141. As applicants for governmental aid, these appellees may not insulate themselves from personal responsibility for compliance with the requirements and conditions of the regulations pertinent to their applications.[6] Having received the object of their aid applications in the form of completed conservation projects, they are individually liable (and jointly liable with Mead) for that portion of the aid payments on their own projects which was obtained by mistake.

Affirmed in part; reversed and remanded in part.

---

6. Knowledge of falsity is not a requisite for recovery under the mistake doctrine. In United States v. De Witt, 5th Cir., 265 F.2d 393, 400, recovery under the mistake doctrine was allowed against a lending institution even though the lender had no knowledge of a false representation in a F H A loan application.