**LTV EDUCATION SYSTEMS, INC.,**
**Plaintiff–Appellant,**

**v.**

**T.H. BELL, In His Capacity as Commissioner of Education and United States of America, Defendants–Appellees,**

**v.**

**VOUGHT CORP. and LTV Corp.,**
**Additional Defendants on**
**Counterclaim–Appellants.**

**No. 87–1649.**

United States Court of Appeals,
Fifth Circuit.

Jan. 12, 1989.

Rehearing Denied Feb. 15, 1989.

Stuart F. Pierson, Richard L. Cys, Mitchell E.F. Plave, Verner, Liipfert, Bernhard, McPherson & Hand, Chartered, Don Charles Lewis, Washington, D.C., for plaintiff-appellant.

Howard S. Scher, Rita S. Geier, William Kanter, Civ. Div., Dept. of Justice, Washington, D.C., for defendants-appellees.

Before WISDOM, REAVLEY and POLITZ, Circuit Judges.

WISDOM, Circuit Judge:

This case involves the efforts of the Department of Education (Education) to recover payments made by it to LTV Education Systems, Inc., (ESI) and various lending institutions on defaulted federally insured student loans (FISL's) based on violations of a federal regulation issued under the Higher Education Act.[1] The district court, after extensive discovery and hearings on numerous motions, granted Education summary judgment on two of its claims against ESI. The court found that ESI had violated a regulation prohibiting payment of any points, premiums, or interest to lending institutions participating in the Federally Insured Student Loan Program (FISLP). ESI was ordered to pay Education, with interest, the amounts Edu-

---

1. Higher Education Act of 1965, 20 U.S.C. §§ 1071–1085.

cation, as an insurer of student loans, paid to ESI and several lending institutions on certain defaulted student loans. The court reduced ESI's liability by the amount of funds Education recovered through settlements with lenders who agreed to repay the inducements they received from ESI in violation of the regulation. On appeal ESI presents several grounds for reversal of the district court's judgment. We address each of these arguments; none, however, warrants reversal.

LTV Education Systems, Inc., established in 1969 as a subsidiary of LTV, acquired 43 trade and business schools in ten states. Approximately 90 percent of ESI's students financed their tuition with low interest federally insured student loans. ESI describes the loan transaction process as follows:

> The student would apply and be accepted to the school; the school would provide the loan or refer the student to a bank; the bank would agree to make the loan and would submit it for insurance to [Education]; [Education] would commit insurance on the loan; and the lender would disburse the proceeds to the school for tuition, books, and supplies.

Appellant's Opening Brief at 11. While the loan is outstanding, lenders are required to pay premiums to maintain insurance coverage. On approved insured student loans, the government pays the interest owed while the student remained enrolled at least half-time at an eligible institution and for nine months there-after. The contract of insurance with an eligible lender requires the government to repay the lender principal and interest on defaulted loans.

During the first few years of its existence ESI participated in the FISLP solely as a school. Through 1971 nearly all FISL's made to ESI students were issued by a single Texas bank, the Texas Bank and Trust Co. of Dallas (TBT). In connection with these loans, TBT required ESI to pay loan origination and service fees and to maintain compensating balances in ESI's deposit accounts at TBT. LTV and its other subsidiaries also maintained compensating balances at TBT. Such requirements undoubtedly made FISL's more attractive to TBT.

On October 31, 1970, Education, apparently concerned that such inducements were undermining equality of access to student loans as a result of discrimination among students and schools by lenders, promulgated the regulation at issue here. The regulation, 45 C.F.R. § 177.6(e)(1)[2], which became effective November 30, 1970, provided:

> (e) Discounting, payment of premiums: cost to the student
>
> (1) No points, premiums or additional interest of any kind may be paid to any eligible lender in order to secure funds for making loans or to induce such a lender to make loans to the students of a particular institution or any particular catagory of students and, except in circumstances approved by the Commissioner, notes (or any interest in notes) evidencing loans made by educational institutions shall not be sold or otherwise transferred at a discount.

A month after the regulation became effective, Education sent a letter to ESI inviting ESI representatives to attend a meeting to discuss the meaning and impact of this and other recently adopted regulations. The letter stated that compensating balances "are in effect payments of premiums which afford a return to the lender (or holder) in excess of that provided for by the statute".[3] ESI was aware that Education interpreted the regulation as prohibiting compensating balances, and ESI later proposed an amendment that would have permitted the maintenance of such balances with lenders as a condition of the lenders' making student loans.[4] During the first year of the rule's existence,

---

**2.** 35 Fed.Reg. 16,888, 16,896 (1970).

**3.** The letter also stated: "Proposals which ultimately provide an extra financial inducement to lenders to provide financing are not less objec-

tionable because that result is produced through a series of transactions".

**4.** Dist.Ct.Mem. Order at 10 n. 14.

ESI continued to pay loan origination and service fees to TBT, and interest supplements to several banks including the Bank of Canton.[5]

When TBT discontinued its FISL activity with ESI in 1972, ESI began acting as a lender as well as a school in the FISLP. Although ESI had obtained Education's approval to enter into a financing arrangement containing a limited flexible interest term that plan, known as the Barnes Proposal, was never implemented. ESI did, however, execute several loan and escrow agreements with several banks, including Citibank, to secure funding for ESI's loans to its students. The L & E agreements which, according to ESI, were modeled on the Barnes proposal, also contained a floating interest rate, but these agreements were not approved by Education. ESI's agreement with Citibank required ESI to maintain compensating balances at the bank. Under the L & E agreements ESI made loans to its students for the remaining 18 months of its existence.

In 1976 Education ceased making payments to ESI on defaulted student loans. Alleging breach of its insurance contract, ESI sued Education in 1976 to recover $3.4 million in insurance claims. The case was removed to federal court and in 1979 the government filed its counterclaims at issue here.

*Questions of Material Fact*

█ ESI contends that the district court erroneously concluded that no genuine issue of material fact remains in this case. Although its brief presents several questions of law styled as questions of fact, we focus initially on the only two potential factual disputes. First, ESI maintains that with regard to any compensating balance requirements contained in the loan and escrow agreements there is a question whether any such balances were *actually* maintained to secure funding in violation of the regulation. ESI relies on two pieces of evidence to demonstrate the dispute over this issue. The first is a Citibank chart dated March 10, 1975, of compensating balances maintained by the LTV group of companies. This document shows a zero next to the percentage maintained by ESI. The chart also discloses however that ESI was required to maintain a 20 percent compensating balance and that other LTV companies actually maintained balances during 1974; in fact, one LTV company maintained more than three times the balance required. Because the regulation prohibited maintenance of compensating balances any time after November 30, 1970, to secure or induce lending, ESI's reliance on one report, which relates only to 1974, is insufficient to raise a genuine factual question. The government's Citibank charts indisputedly show that a compensating balance of over 23 percent was maintained in LTV Aerospace's consolidated account with ESI during 1971 and 1972. ESI argues, but offers no tangible evidence showing, that LTV's and its other subsidiaries' compensating balances were wholly unrelated to Citibank's FISL activities with ESI. ESI admits, however, that on February 23, 1973, Citibank increased its loan commitments to ESI by three million dollars. Both LTV and Citibank officials acknowledged that compensating balances were maintained by the aggregate LTV companies, and a Citibank official testified that the bank looked to the aggregate balances in determining whether to extend additional loans to a company in the LTV group. The evidence also discloses that LTV Aerospace—the parent company of ESI—was a party to the loan and escrow agreements. In a March 6, 1975 letter to Ernst & Ernst, LTV's independent auditors, Citibank stated that "[t]he company [LTV and its subsidiaries] consider the combined cash balances and borrowings of [the companies] in calculating the compensating balance arrangements". Furthermore, in a March 1, 1974 letter to Ernst & Ernst, Citibank stated:

> The company was in substantial compliance with the compensating balance arrangements during the year [1973] and subsequently through the date of this letter.

---

**5.** These findings made by the district court are not disputed by ESI on appeal.

To refute all of this evidence that compensating balances were maintained at Citibank to secure additional FISL lending for ESI, ESI points to an affidavit of its expert, Harry Prieto, in which Mr. Prieto testified that regardless of the bank's expectations, balances were not maintained to facilitate ESI borrowings. We agree with the district court, however, that because Mr. Prieto failed to consider the compensating balances of the LTV companies in the aggregate, as Ernst & Ernst and Citibank agreed was the accepted practice of Citibank, the affidavit is not probative on this issue.

Summary judgment is granted under Rule 56(c) if record evidence shows that there is no genuine issue regarding any material fact and the movant is entitled to judgment as a matter of law. Where, as here, a properly supported motion for summary judgment has been made, the adverse party may not rest on mere allegations or denials of the movant's pleadings. Fed.R. Civ.P. 56(e). The material fact must be disputed "genuinely", that is, the evidence must be such that a reasonable jury could reach a verdict favoring the nonmoving party. *Anderson v. Liberty Lobby, Inc.*[6] Summary judgment is proper when the opposing party's evidence is merely colorable or is not significantly probative.[7] We conclude that ESI's evidence, the Prieto affidavit and the 1974 bank chart, are insufficient to raise a genuine dispute as to whether ESI, or other LTV companies, actually maintained compensating balances at Citibank at any time after November 30, 1970 to secure funding for ESI's student loans.

ESI's second asserted factual dispute involves settlement agreements between Education and two banks that participated in the student loan program as lenders to ESI. We need only address the effect of one of these agreements on ESI's amenability to this suit.[8] ESI admits that it was not formally a party to the settlement between Education and TBT. It argues, nevertheless, that it should receive the benefits of that settlement and therefore be immune from this suit because it made a joint settlement proposal with TBT, participated in the negotiations, and obtained an assurance of Education's "general willingness" to accept the proposal.[9]

ESI interposes the settlement between TBT and the government as a bar against the government's claims in this suit and therefore ESI bears the burden of proving its inclusion in the release.[10] Because the government has properly supported its summary judgment motion, ESI is required by Rule 56(e) to put forth affidavits, depositions, and other evidence designating " 'specific facts showing that there is a genuine issue for trial.' "[11]

In determining whether the TBT settlement protects ESI from this suit we must look to the intentions of the parties to the agreement. We are guided by the principle that where a cause of action lies against several individuals or entities a party releases only those whom he intends to release. *Zenith Radio Corp. v. Hazeltine Research.*[12] Where the parties' intentions can be ascertained from the unambiguous language of the instrument, construction of the release is a question of law for the court. *Weingart v. Allen and O'Hara,*

---

**6.** 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211–12 (1986).

**7.** *Id.* (citing *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569, 591–92 (1968); *Dombrowski v. Eastland,* 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967) (per curiam)).

**8.** There is no substantial probative evidence supporting ESI's contention that it is legally protected by a similar settlement between Education and Alamo Bank.

**9.** Appellant's Opening Brief at 48–49.

**10.** *See Murtagh v. University Computing Co.,* 490 F.2d 810 (5th Cir.1974), *cert. denied,* 419 U.S. 835, 95 S.Ct. 62, 42 L.Ed.2d 62 (1974); *Flowers v. Diamond Shamrock Corp.,* 693 F.2d 1146, 1151 (5th Cir.1982).

**11.** *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 274 (1986).

**12.** 401 U.S. 321, 347, 91 S.Ct. 795, 810, 28 L.Ed. 2d 77, 97 (1971).

*Inc.*[13] If the settlement is ambiguous, however, and the parties' intentions cannot be determined as a matter of law, a jury must decide this factual issue.

In the present case there are two documents that must be interpreted to ascertain the intentions of the parties.[14] The first is TBT's proposal in which ESI participated. This document, a letter from TBT to Education, dated October 31, 1973, disclosed that the following fees were received from ESI in 1971 in violation of the Regulation: a one-time $25 fee for each loan, an amount equal to 3.8 percent per annum of the aggregate outstanding balance of FISL's, settlement an interest supplement equal to the difference between its return on student loans and on other loans. Similar fees were received during 1970. The bank stated that it voluntarily disclosed this information and offered to make restitution of the illegal payments to eliminate doubt as to TBT's status as an eligible lender and to facilitate TBT's planned affiliation with a Texas bank holding company. TBT asserted its understanding that the government: (1) would not question TBT's status as an eligible lender, or the effectiveness of the Commissioner's insurance on loans made by TBT, and (2) would not assert any liability of the bank or ESI regarding the payments deemed in violation of the regulation. In its November 15, 1973 response sent to TBT's proposal, Education stated:

> "On the basis of the *representations made* in that meeting and in *your* letter, we are able to confirm that *your Bank's* taking prompt steps to identify and restore payments ... of the kind described in your letter ... would avoid our taking any action which would *either* adversely affect the status of the Bank as an eligible lender ..., or raise doubt as to the effectiveness of the Commissioner's in-

surance of loans made under the program that might be associated with the prohibited payments and charges. As was *indicated to you* at the meeting, our willingness to agree to this approach in this case stems in no small measure from the open, frank and voluntary nature of *your* disclosure."

Noticeably absent from both documents is any mention of ESI's maintenance of compensating balances at TBT in violation of the Regulation. Also conspicuously omitted from the government's response is acquiescence to TBT's request that ESI be released from liability arising from any illegal payments. Even if we viewed Education's promise not to question the effectiveness of the insurance as ambiguous in terms of its possible application to ESI, we find no evidence in these documents or otherwise that the government intended to waive its rights against ESI regarding violations of the Regulation that were not disclosed in the settlement negotiations, namely the compensating balances maintained by ESI at TBT after the regulation was adopted.[15] Moreover, ESI offers no probative evidence that at the time of the settlement, Education intended to release ESI from liability for violating the Regulation. We conclude, therefore, that ESI is not protected by the TBT settlement.

■ Although ESI was not released by either the TBT or Alamo National Bank settlement, it is entitled to offset the amounts paid by those entities against the amount ESI owes the government for violating the Regulation. An economically injured party is entitled to only one satisfaction for his injury. *Ratner v. Sioux National Gas Corp.*[16]

*Issues of Law*

■ In its brief ESI also raises several legal issues that it contends the district

---

**13.** 654 F.2d 1096, 1103 (5th Cir.1981).

**14.** ESI relies on a letter from Education to TBT written nearly one year after Education's official response to TBT's proposal. This letter does not state that ESI was included in the settlement, it merely quotes the part of TBT's proposal requesting that no liability be asserted against ESI and it reiterates the government's agreement to accept restitution from TBT.

**15.** Although ESI asserts that it disclosed its compensating balance arrangement with TBT to the government during the subsequent audit, the record does not show any such disclosure by or on behalf of ESI.

**16.** 719 F.2d 801 (5th Cir.1983).

court resolved incorrectly. Only two of its arguments merit discussion here.[17] Because we agree with the district court that the points and premiums regulation applies to schools as well as to lenders and that ESI violated the regulation, we first focus our attention on ESI's argument that the district court erred in holding that the government is entitled to recover from ESI the amount of payments plus interest, on the defaulted loans tainted by ESI's violations of the regulation, while participating in the FISLP as either a school or a lender. We are mindful that with regard to the TBT loans the government seeks recovery not from the entity that received the insurance proceeds on the defaulted loans (TBT) but from the third party that indirectly received the loan funds as payment for tuition.

We start by observing that there is a dearth of case law involving the government's enforcement of FISLP regulations as a method of recouping payments already made on defaulted student loans. In fact this case apparently presents the government's first reported judicial enforcement of the points and premiums regulation, a regulation promulgated 18 years ago. In an earlier case we commented on the government's recent decision to utilize litigation to enforce FISLP regulations in a much more lucrative manner. *Hicks v. Harris* [18] involved the government's successful effort to avoid payment on defaulted loans based on lenders' technical violations of a FISLP insurance regulation. Lower level employees of the Department of Education had taken the position that insurance would be valid despite lenders' minor deviations from the specified procedures for obtaining insurance. Later, the government, shielded from an equitable estoppel attack because it was exercising its "sovereign powers" in encouraging participation in FISLP, vitiated its insurance coverage by relying on the letter of its regulation and refused to pay lenders' claims on defaulted loans. We voiced our dissatisfaction with the government's chameleon-like approach in *Hicks:*

> [W]e believe that the government in this case has not turned square corners in its business dealings with its citizens.
>
> . . .
>
> The current doctrine prohibiting estoppel against the government allows no consideration of the rationale underlying the rules of agency in ordinary fair business dealings or of the reasonableness of the citizen's reliance on the conduct or statements of government employees.[19]

In the present suit the government has deviated from its earlier position that violations of the points and premiums regulation would not impair insurance benefits contracted for previously.[20] We are also aware that ESI likely not only considered itself protected by the TBT settlement, in which the government promised not to raise questions regarding the validity of insurance on the affected TBT loans, but also relied on the government's previous position that its remedy for violations of the points and premiums regulations was recovery of the amount of illegal payments. Although we are clearly bound by our precedent denying equitable estoppel against the government for its FISLP activities,[21] we limit our holding that the government can recover payments from a

---

17. ESI also attacks as erroneous the district court's reasoning and conclusions concerning:
(1) Whether the regulation's prohibition against payment of "points, premiums and interest of any kind" bars compensating balances;
(2) If so, whether compensating balances maintained after the effective date of the regulation but in connection with pre-regulation loans may be and are prohibited; and
(3) Whether the regulation applies to eligible schools as well as eligible lenders.
We find the district court's analyses regarding these issues well reasoned and its conclusions sound. Finally, we find ESI's contention that the government's computer evidence is inadmissible or unreliable to be without merit.

18. 606 F.2d 65 (5th Cir.1979).

19. *Id.* at 67, 70.

20. Letter of William H. Taft, IV, General Counsel to Education Division, to Crocker National Bank (Nov. 23, 1976).

21. *Hicks v. Harris,* 606 F.2d 65 (5th Cir.1979).

third party pursuant to FISLP insurance that was valid when issued to cases involving knowing violations of the points and premiums regulation by that third party.

It is well established that the government, without the aid of a statute, may recover money it mistakenly, erroneously, or illegally paid from a party that received the funds without right. *United States v. Wurts.*[22] Moreover, the government is entitled to obtain repayment from a third party into whose hands the mistaken payments flowed where that party participated in and benefitted from the tainted transaction. *United States v. Mead.*[23] There is no question that ESI benefitted from the loans made to ESI students by TBT. ESI received the loan proceeds in the form of tuition. Thus, although the government's payments on defaulted TBT loans did not flow to ESI, the student loan transaction—from the initial joint application by ESI and TBT to Education to the issuance of the loan to the government's payment after default—depended heavily on ESI's actions and directly benefitted ESI. The order in which the funds flowed is immaterial.

We recognize that allowing the government to recover amounts already paid on insurance claims relating to defaulted student loans based on its changed view of the effect of a violation of the points and premium regulation contravenes the general insurance law principle that recovery does not lie where the mistake is one of law.[24] Because we have concluded that Education's interpreta-tion of its points and premiums regulation is reasonable, notwithstanding the schizophrenic character of Education's enforcement policy, we adhere to the principle that a governmental entity's construction of its own regulation is entitled to deference.[25] In so doing, we are recognizing the strong national interest in the success of the federally insured student loan program.[26] The regulation involved here was adopted to promote equality of access to federally insured low interest student loans. Where as here, a participant in the program, fully aware of the government's interpretation of what constitutes a violation, chooses to proceed in the openly defiant manner ESI pursued here, it must be prepared to suffer the consequences of its actions. Thus, despite Education's less than admirable shift in enforcement policy we conclude that the district court properly granted recovery under the doctrine of mistake.

*Suppression of Grand Jury Materials Obtained by Government*

■ ESI's remaining legal argument meriting discussion concerns evidence obtained by the government from an earlier grand jury proceeding involving ESI. In 1978 this Court denied ESI's motion to stay an order granting the Civil Division of the Department of Justice access to grand jury materials used in this case. We found it unlikely that ESI would succeed in showing the disclosure order was an abuse of discretion.[27] This Court determined that Rule

---

**22.** 303 U.S. 414, 58 S.Ct. 637, 82 L.Ed. 932 (1938). *See also United States v. Borin*, 209 F.2d 145 (5th Cir.1954); *United States v. Mead*, 426 F.2d 118 (9th Cir.1970).

**23.** 426 F.2d 118 (9th Cir.1970). *See also Drew Chemical Corp. v. M/V Pacific Horizon*, 84 F.R.D. 127 (D.C.Z.1979).

**24.** *See* G. Couch, Couch on Insurance 2d § 74:192 at 693–94 (1983) (citing *e.g., Pennell v. United Ins. Co.*, 150 Tex. 541, 243 S.W.2d 572 (1951)).

**25.** *See, e.g., Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22, 31 (1980); *Citizens Sav. Bank v. Bell*, 605 F.Supp. 1033, 1041 (D.R.I.1985) ("Education's interpretation of its own guidelines is entitled to substantial deference.").

**26.** The Department of Education recently projected that costs for GSL defaults will be $1.6 billion in fiscal year 1988, representing a 200 percent increase over the last five years. The Department has issued proposed regulations aimed in part at educational institutions with high default rates. To avoid limitation, suspension or termination of its participation in the guaranteed student loan program, whichever is proposed by the Department, an institution with a fiscal year default rate of over 20 percent would be required to demonstrate that its excessive default rate is due to factors beyond its control. Department of Education Proposed Regulations, 53 Fed.Reg. 36,216 (1988) (to be codified at 34 C.F.R. pts. 668 & 682) (proposed Sept. 16, 1988).

**27.** *In re Grand Jury*, 583 F.2d 128 (5th Cir.1978).

6(e) of the Federal Rules of Criminal Procedure permits disclosure in these circumstances even absent a showing of particularized need by the government. In this subsequent civil action, ESI moved the district court to suppress grand jury evidence because of alleged grand jury abuse by the government. In denying the motion, the district court noted that there is no evidence of grand jury abuse and that full disclosure rather than suppression would adequately protect ESI if grand jury abuse had been shown. The district court later denied ESI's motion to reconsider the order. Nevertheless, ESI maintains that the 1976 Rule 6(e) disclosure order and the district court's 1981 ruling on the suppression motion violated standards established later by the Supreme Court in *United States v. Sells Engineering, Inc.*[28] In *Sells* the Supreme Court held that under Rule 6(e) disclosure of grand jury materials to government attorneys in a civil suit is permissible only after a showing of "particularized need". Although there is a strong presumption that new judicially-created civil rules are to be applied retroactively,[29] in certain circumstances such rules operate prospectively only.[30] Because we conclude that even if retroactive application of *Sells* is appropriate in this case, the district court ruled properly on the suppression motion,

we find it unnecessary to address the retroactivity issue.[31]

The disclosure order at issue here fully complied with this Court's pre-*Sells* interpretation of Rule 6(e). The facially valid Rule 6(e) order was relied on in good faith by the Civil Division of the Department of Justice. Even in criminal cases suppression in the circumstances present here would be improper under the Supreme Court's holdings in *United States v. Peltier*[32] and *United States v. Leon.*[33] In *Peltier* the Court refused to apply retroactively a decision that would have required suppression of evidence from a warrantless border patrol search. Because the officers acted in good faith and in reliance on prevailing statutory and constitutional judicial interpretation, suppression would have neither promoted judicial integrity nor deterred future misconduct by law enforcement officials.[34] Similarly, in *Leon* the Court ruled that evidence in a criminal trial should not be suppressed if law enforcement officers rely in objective good faith on a facially valid warrant that is later determined to be invalid.[35] In the circumstances of this case, suppression of the grand jury materials would in no way serve the remedial purposes of the exclusionary rule.[36] We conclude, therefore, that the

**28.** 463 U.S. 418, 103 S.Ct. 3133, 77 L.Ed.2d 743 (1983).

**29.** *See, e.g., Robinson v. Neil,* 409 U.S. 505, 507–08, 93 S.Ct. 876, 877, 35 L.Ed.2d 29 (1973).

**30.** Under *Chevron Oil Co. v. Huson,* a new civil rule is not applied retroactively if it establishes a new legal principle; retroactive application would not further its purpose; and retroactive application would be inequitable. 404 U.S. 97, 106–07, 92 S.Ct. 349, 355, 30 L.Ed.2d 296, 305–06 (1971).

**31.** We note, however, that several courts have held that the *Sells* decision does not apply to facially valid pre-*Sells* disclosure orders. For example, in *United States v. (Under Seal),* 783 F.2d 450 (4th Cir.1986), *cert. denied,* 481 U.S. 1032, 107 S.Ct. 1964, 95 L.Ed.2d 535 (1987), the Court applied the three-part *Chevron* test and held that *Sells* would not be applied retroactively to invalidate a prior Rule 6(e) disclosure order despite the lack of a particularized need finding. Because the order was valid when issued and was relied on in good faith, overturning the district court's order would not further

the grand jury secrecy interest of Rule 6(e). The Court also found that because *Sells* established a new principle of law and retroactive application would be inequitable. Thus all three *Chevron* factors supported prospective application of *Sells*. *See also In re Grand Jury Proceedings (Kluger),* 631 F.Supp. 1542 (E.D.N.Y.1986), *aff'd in relevant part,* 827 F.2d 868 (2d Cir.1987).

**32.** 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975).

**33.** 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

**34.** *See Peltier,* 422 U.S. at 537–39, 95 S.Ct. at 2317–18, 45 L.Ed.2d at 381–82.

**35.** 468 U.S. at 919–20, 104 S.Ct. at 3421, 82 L.Ed.2d at 696–97. *See also United States v. Williams,* 622 F.2d 830, 842 (5th Cir.1980).

**36.** We note that the Court of Appeals for the Third Circuit, applying the reasoning of *Peltier* and *Leon,* has also held that information ob-

district court's denial of the defendant's suppression motion was proper.

The district court's order granting Education's motion for summary judgment is AFFIRMED.

tained in grand jury proceedings that would now violate Rule 6(e) would not be suppressed where officials relied in good faith on facially valid Rule 6(e) orders. *See Graham v. Commissioner of Internal Revenue,* 770 F.2d 381, 385–86 (3d Cir.1985); *Caprio v. Commissioner of Internal Revenue,* 787 F.2d 109 (3d Cir.1986).