USCA1 Opinion

 

 December 31, 1992 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 92-1496 UNITED STATES OF AMERICA, Plaintiff, Appellant, v. DATA TRANSLATION, INC., Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Edward F. Harrington, U.S. District Judge] ___________________ ____________________ Before Breyer, Chief Judge, ___________ Torruella and Selya, Circuit Judges. ______________ ____________________ Jonathan R. Siegel, Attorney, Department of Justice, with whom ___________________ Stuart M. Gerson, Assistant Attorney General, A. John Pappalardo, _________________ ___________________ United States Attorney, and Douglas N. Letter, Attorney, Department of _________________ Justice, were on brief for appellant. Laurie R. Wallach with whom Steven A. Kaufman and Ropes & Gray _________________ __________________ _____________ were on brief for appellee. ____________________ ____________________ BREYER, Chief Judge. In 1983 Data Translation, ___________ Inc. ("DTI") agreed to sell its computer boards to the federal government at a price negotiated by the federal government's central civilian purchasing agency, the General Services Administration ("GSA"). The Government subsequently brought suit, claiming that, when GSA and DTI negotiated the contract, DTI failed properly to disclose the prices at which it sold its boards to other, non- governmental customers. That failure, the Government says, violated the terms of the subsequent contract and the federal False Claims Act, 31 U.S.C. 3729 et seq. _______ In the district court, both judge and jury disagreed with the Government. The judge found that the Government had not presented enough evidence to warrant submitting its "breach of contract" claim to the jury. The jury found that DTI did not violate the False Claims Act. The Government, in this appeal, argues 1) that, given the evidence, the court should not have directed a verdict on the "breach of contract" claim, and 2) that the court did not properly instruct the jury about the meaning of the False Claims Act. After reviewing the record, we conclude that both lower court determinations were legally correct. And, we affirm the judgments. I The "Breach of Contract" Claim ______________________________ The Government's breach of contract issue -- that the evidence was strong enough to warrant submitting the case to the jury -- presents the more difficult question on appeal. We note that, had the district court reserved judgment on the defendant's motion for directed verdict, while submitting the contract claim along with the False Claims Act claim to the jury, the jury might well have found in the defendant's favor. (After all, the jury found in the defendant's favor on factually similar False Claims Act matters). In that event, the district court would not have had to decide the directed verdict question then and there, and this court (if the jury had found in the defendant's favor) would have faced the easier task of deciding whether the evidence was sufficient to support a negative jury verdict; and, only if the jury had found in the plaintiff's favor would we have had to decide the more difficult question (here presented) of whether the evidence was, as the district court held, insufficient to support a -3- 3 potentially positive verdict. Regardless, we have answered this latter question. We have read the record, asking ourselves whether any reasonable juror could have found in the Government's favor. We conclude that the answer to the question is "no." Because of the record's complexity, the explanation of how we have reached this conclusion will be lengthy. A Background __________ 1. The Company. DTI makes an electronic board ____________ which, when inserted in a computer, allows the user to measure flows and pressure changes in gasses and liquids. This computer capability is useful in medicine (e.g., ____ monitoring the condition of artificial hearts), in science (e.g., detecting abnormal genes), and in industry (e.g., ____ ____ detecting flaws in large quantities of rapidly moving paper). Before 1983, DTI sold its boards to its federal government customers (e.g., the Center for Disease Control ____ in Atlanta) primarily through a government procurement process called "sole source" procurement, a process that required each individual agency to fill out fairly elaborate forms each time it wanted to buy even one or two boards from DTI. See 41 U.S.C. 254, 254(d)(1)(a) (summarizing ___ -4- 4 disclosure requirements); see also Pub. L. No. 98-269, 98 ___ ____ Stat. 1184 (1984) ("Competition in Contracting Act") (extending disclosure requirements to civilian, as well as military, procurement). In 1983, at the urging of some of its federal government customers, DTI decided to negotiate, through GSA, a single contract, called an "MAS contract," with price terms applicable to orders placed by any federal government agency -- a contract that DTI hoped would simplify the selling process. 2. The "Multiple Award Schedule" ("MAS") ___________________________________________ Contract. The GSA will normally negotiate MAS contracts for ________ products sold by firms in competitively structured _____________ industries. At the beginning of the negotiation GSA will obtain detailed information about, e.g., product quality and ____ prices at which the firm sells the product to other, private customers. It will then negotiate a price for the government. If the negotiation succeeds, GSA will list the firm's product, along with similar products sold by competing firms (with MAS contracts), in a catalogue. Individual government agencies may place orders for any item listed in the catalogue (at the price there listed) without the elaborate paperwork that other government procurement -5- 5 programs require. See 41 U.S.C. 254(d)(5)(A)(ii) ___ (disclosure requirements need not be applied where agency finds contract price is based on "established catalog or market prices of commercial items sold in substantial quantities to the general public."); 47 Fed. Reg. 50,252 (November 5, 1982) (GSA policy statement on pricing of items sold under MAS contracts). The GSA's MAS contract does not ________ commit the government to buying the product. Rather, it ______________________ provides an option for federal government agencies to buy at ______ a particular price, an option that individual agencies may, or may not, exercise. 3. The Negotiations. In April 1983 a GSA _________________ employee, Dewey Carr, and a DTI employee, Elizabeth Bruce, negotiated the terms of an MAS contract. The GSA asked DTI to fill out a detailed, complex seventy-eight page questionnaire, entitled "Solicitation, Offer and Award." With Mr. Carr's assistance, Ms. Bruce (who, at the time, was nineteen years old) prepared the answers to the seventy- eight page questionnaire. These answers, along with the statements in the document, constituted the "Offer." The GSA accepted the "Offer." The resulting MAS contract permitted DTI to sell its boards (and certain other items) to government agencies at DTI's ordinary list prices less a ten -6- 6 percent discount, provided that the ordering agency placed orders for no more than ten items at any one time. (This proviso reflected Mr. Carr's recommendation that any agency placing a larger single order should negotiate with DTI for a larger discount.) 4. The Claimed Contract Violation. Omitting _________________________________ unnecessary factual complexities and qualifications, we can characterize the Government's "breach of contract" claim as resting essentially on the proposition that DTI, when it submitted its "Offer," did not disclose all the computer board price discounts it gave to its non-governmental customers. To understand how this alleged nondisclosure could constitute a contract violation, one must examine several contract provisions, which cross-reference each other. a. The "Defective Pricing Clause". The contract _______________________________ clause that the Government claims DTI directly violated is called the "Defective Pricing Clause." It says: If, subsequent to the award of any __ contract resulting from this solicitation, it is found that any price _________ negotiated . . . was increased by any ________________________________________ significant amount because the prices, ________________________________________ data, and facts were not as stated in ________________________________________ the offeror's "Certificate of ________________________________________ Established Catalog or Market Price," ________________________________________ then the contract price(s) shall be ________________________________________ reduced by such amount and the contract _______ -7- 7 shall be modified in writing to reflect such adjustment. (Emphasis added.) b. The "Certificate of Established Catalog or ___________________________________________ Market Price." The "Defective Pricing Clause" refers to _______________ "prices, data, and facts" that DTI set forth in its "Certificate of Established Catalog or Market Price." This Certificate, contained in the seventy-eight page questionnaire/"Offer," says that DTI certifies that all "data submitted" are "accurate, complete and current." c. The Relevant "Data Submitted." DTI included, ______________________________ as part of its questionnaire/"Offer," a three-page summary of discounts from its list prices that it made available to nongovernmental customers. This three-page summary purported to respond to the questionnaire's direction to provide price discount information. In addition, Ms. Bruce, the DTI employee, orally described DTI pricing practices to the GSA negotiator Dewey Carr, and she provided Carr with relevant DTI documents which she had received from other employees at DTI. In the Government's view, this "data submitted" was not "complete," for it did not fully describe two further sets of discounts that DTI offered certain customers, namely 1) discounts to "Special Price Customers," and 2) "Volume Purchase Agreement" discounts. The former -8- 8 (as the name suggests) consists of large discounts to certain individual customers; the latter consists of large discounts based on total quantity ordered during a given time period (say, a year). d. The Upshot. The cross-referenced provisions __________ amount to a contractual promise by DTI that its questionnaire price discount responses are not significantly _____________ inaccurate or incomplete. The Government says that it broke ________________________ this promise. The Government's case rests upon its claim that neither the three-page summary of DTI discounts, nor any other information DTI provided, listed or fully described the "Special Price Customer" and "VPA" discounts that DTI offered other, private customers. As we have said, the district court, after hearing the evidence, granted a directed verdict for DTI. And, the Government appeals. B The Evidentiary Issue _____________________ The district court, when granting its directed verdict, commented cryptically, I don't believe that there was a meeting of the minds, and, therefore, there was no contract. -9- 9 The Government correctly points out that this remark, read literally, cannot provide a ground for directing a verdict in DTI's favor. The parties agreed there was a contract; they disagreed only about whether or not DTI's "price discount" questionnaire responses amounted to a violation. Nonetheless, the district court had a point. When a single portion of a lengthy contract is unintelligible, but yet severable from the remainder, a court may strike that portion itself without affecting the enforceability of the remainder. See, e.g., Eckles v. Sharman, 548 F.2d 905 ___ ____ ______ _______ (10th Cir. 1977) (vague contract provision unenforceable and severable if not essential to contract); McArthur v. ________ Rosenbaum Co., 180 F.2d 617, 619-20 (3d Cir. 1950) ______________ (radically ambiguous option contract unenforceable, especially since option contract construed in favor of party granting option). Thus, we still must ask whether a reasonable juror could find the price-discount disclosure provisions sufficiently comprehensible to enforce. Compare _______ C.H.I., Inc. v. Marcus Bros. Textile Inc., 930 F.2d 762, 764 ____________ _________________________ (9th Cir. 1991) (question of whether clause is fatally ambiguous and therefore unenforceable is matter of law for judge to decide) and Fashion House, Inc. v. K Mart Corp., ___ ____________________ ____________ 892 F.2d 1076, 1083 (1st Cir. 1989) (same) with Gel Systems, ____ ____________ -10- 10 Inc. v. Hyundai Engineering and Construction Co., Inc., 902 ____ _______________________________________________ F.2d 1024, 1027 (1st Cir. 1990) (construction of clause for finder). If not, the judge should direct a verdict against which two permissible meanings exist is question for fact- the party demanding enforcement of the clause. (This is 11 -11- And, in deciding the question of the perspective of a reasonable person in DTI's position. _________________ not necessarily as the GSA intended them, but rather from See Restatement (Second) of Contracts 200, 203 (1981). ___ ___________________________________ comprehensibility, one must examine the relevant provisions, provisions virtually unintelligible if read literally. ____________________ From this perspective, we find the language of the discount what we believe the district court intended.) Unlike the district court, however, we also believe one may them intelligible. Nonetheless, that fact does not help the The "Literal" Language ______________________ C complied with its obligations. Government, for, on this practical interpretation, DTI The Government has asked the district court and this court to read the contract's "discount disclosure" language literally, as requiring DTI to reveal every price ___________ give the language a practical interpretation which makes _________ discount it provided any of its customers ever -- a ________ ___ ____ revelation that DTI must concede it did not make. The Government points to language that does seem to call for such complete disclosure. The seventy-eight page form, at the top of the first"price discount" information page, says: List below the best discount and/or concessions resulting in the lowest net price (regardless of quantity and terms and conditions) to other than authorized GSA contract users from pricelist for the same or similar products or services offered to the Government under this solicitation. (Emphasis omitted.) The page lists a host of possible kinds of discount, including: regular discounts . . . quantity discounts . . . aggregate discounts . . . commissions . . . prompt payment . . . FOB point . . . [and] other . . . . It then asks: Do you have in effect, for any customer of any class within the MOL [the "Maximum Order Limitation," which in DTI's case was the ten item maximum that, under the MAS contract, an agency could order at any one time] or outside of the MOL, other discounts and/or concessions including but not limited to the following, regardless of pricelist, which result in lower net prices than those offered the Government in this offer? -12- 12 And, it lists further possible kinds of discounts, including: rebates of any kind . . . multiple quantity unit pricing plan . . . cumulative discounts . . . products that may be combined . . . [and] others. Leaving no stone unturned, the form defines "discounts" as: reductions to catalog or market prices (published or unpublished) applicable to any customer, including OEM's, dealers, distributors, national accounts, states, etc.; and any other form of price reductions such as concessions, rebates, quantity discounts, allowances, services, warranties, installation, free parts, etc., which are granted to any customer. At trial, the Government called as a witness, Edward McAndrews, the GSA expert who developed the GSA procurement policy that this language summarizes. He said that the language means what it says: namely, that a company wishing to sell, say, pencils, typewriters, or computer parts, to the government, must list any lower price, or any variation from its "standard terms and conditions" that the company had granted to anyone, ever. That expert ______ ____ testified: Q: [Y]ou're supposed to put in the top matrix here how you do business in a standard way? A: That's correct. Q: Based on a price list you're using as an offer to GSA? -13- 13 A: Absolutely. Q: Below it says, 'If you've got other price lists and other discounts, tell us what they are,' right? A: Or any other concession. Q: Concession. What's a concession if it's not a discount? A: It could be terms and conditions. Q: Terms and conditions? A: That's correct. Q: So if there is ever a situation in which you vary from your standard terms and conditions, ever, ever, you're supposed to report that ____ ____ down there? A: Yes. Q: Ah. And you're supposed to report every _____ instance of it? ________ A: Yes, so we can evaluate that. Q: Every time, huh? A: Yes. Q: So if a company has a thousand customers and it has a standard way of doing business which it describes in the matrix, but for some 15, 20, 30 customers who are bigger than the seller. . . . A: Mm-hmm. Q: . . . the company agrees to the buyer's standard T's and C's [Terms and Conditions], which are going to differ buyer from buyer, right? -14- 14 A: Sure. Q: Every time it does that, it's got to record that down there? A: It's what it's supposed to do. (Emphasis added.) We concede the circumstance to which the Government points with pride, namely, the exhaustiveness of the disclosure that the language literally demands. But, it is that very circumstance that creates a problem. Exaggerating to explain our point, we find the Government's interpretation a little like that of, say, a park keeper who tells people that the sign "No Animals in the Park" applies literally and comprehensively, not only to pets, but also to toy animals, insects, and even chicken sandwiches. If one met such a park keeper, one would find his interpretation so surprisingly broad that one simply would not know what he really meant or what to do. We do not mean to say this farfetched example directly applies here. But, the example, considered in light of our explanation below, may help the reader understand why we think a literal reading of the disclosure form creates ambiguity and incomprehensibility, and why we conclude that no reasonable person, negotiating with GSA negotiator Carr, could have believed that the Government really wanted the complete and total disclosure -15- 15 for which the language seems to ask. We rest this conclusion upon the combined force of three sets of considerations, which we shall now discuss in turn: 1. Business Context. An ordinary business person ________________ would not seem likely to interpret the form literally, for, read literally, the form asks a business to shoulder a compliance burden which will often seem inordinately difficult or impossible to carry out. Consider, for example, an office supply firm, or a furniture company, or a computer parts manufacturer, operating in a competitive industry. Such a firm, selling its products to tens of thousands of different customers, through a host of different sales personnel, might vary prices considerably, in response to shifting competitive pressures, from market to market, from time to time, or from one customer to another, either through direct price cuts or through the creation of small "terms of trade" advantages. To require a paper report of every such variation is to require a paperwork blizzard, even assuming that the company keeps track, on paper, of every variation, not only in the price, but also in the price-related terms and conditions of sale. The record supports this surmise, for it makes clear that government suppliers have not read the language ___ -16- 16 literally. GSA expert McAndrews conceded that, despite potential double damage penalties for failing to comply with the form's instructions, see 31 U.S.C. 3729 (1982), he has ___ never seen any firm ever comply with the form's request, taken literally. When asked whether he had ever seen a comprehensive listing of "price reductions" in the form of "concessions" through variations in "terms and conditions" of sale, he said that he had not. And, he went on to testify as follows: Q: Have you ever seen [a comprehensive listing of variations from standard terms and conditions] done? A: I have not personally seen one done. Q: Have you looked at these things -- response[s] [by companies to the Government's questionnaire]? A: Yes. Q: And have you ever seen anybody ever do that? A: Not frequently. Q: Have you ever seen anybody do it? A: I've seen people submit data on, in terms of the conditions. Q: Have you ever seen anyone describe in [Section] 3-B [of the discount disclosure questionnaire] every time they vary from their standard terms and conditions? -17- 17 A: No, I have not. . . . . Q: So nobody ever answers these questions truthfully? A: That's probably true. This testimony, by the GSA expert (and coauthor of the questionnaire) supports the common sense, objective conclusion that a reasonable supplier would not read the language, in context, as calling for complete, literal disclosure, whatever the GSA author subjectively may have intended. See Garbincius v. Boston Edison Co., 621 F.2d ___ __________ __________________ 1171, 1177 (1st Cir. 1980) (contracts should be construed to reach sensible result if possible); E. Allan Farnsworth, Farnsworth on Contracts Vol. II, 7.10, at 255 (standard of _______________________ reasonableness as fundamental principle of contract interpretation). See also id., 7.11, at 265-66 (an ___ ____ ___ ambiguous form contract is construed against the drafter). 2. The Statutory Context. A literal reading is ______________________ also unnatural because it seems to undermine, or at least to implement inappropriately, the purposes of the statutory program of which the GSA form is an instrument. Congress authorized, and the GSA designed, the MAS program as a simplified alternative for government procurement of common __________ -18- 18 items sold competitively in the commercial marketplace. See ___ H.R. Rep. 1157, 98th Cong., 2d Sess. 18 (1984) (legislative history of the Competition in Contracting Act of 1984, Pub. L. No. 98-369, 98 Stat. 1175 (1984)) ("While the use of competition may not be considered worthwhile by some officials, it is the only way for the government to obtain the best products for the best prices. . . . Clearly, economy and efficiency must be the cornerstone of the Federal procurement system and H.R. 5184 provides the means to accomplish this goal.") Where competition helps to keep the prices of commonly purchased items low, the program permits a government agency, say, a local Park Service office, to buy, say, a lamp, without asking lamp suppliers to undergo the rigorous government "bid-procurement" process or the highly detailed, time-consuming inspections and audits that accompany (non-bid) "sole source" procurement. See 47 Fed. Reg. 50,252 (description of GSA policy on ___ pricing of MAS contracts). Under the MAS program, the existence of competition in the commercial marketplace itself helps to provide assurance of low prices for the government as well. The listing of several competing, say, lamp manufacturers in the government MAS catalogue provides added assurance of low prices. The MAS negotiating process, -19- 19 with its questionnaire answers (and later audits to ensure compliance) offers a third way to guarantee "low prices." To the extent, however, that the questionnaire and audits become as burdensome as the "sole source" selection process, the MAS program abandons its basic "simplification" rationale. See id. at 50,243; Robert S. Brams & Daniel J. ___ ___ Kelly, Multiple Award Schedule Contracting: A Practical ____________________________________________________ Guide to Surviving Its Shortcomings, Ambiguities and ____________________________________________________________ Pitfalls, 19 Pub. Cont. L.J. 441, 453-60, 467-72 (1990). ________ Indeed, if the MAS properly selects its products from those sold in truly competitive commercial markets, elaborate paperwork, audits, and inspections, then, by significantly increasing competitive firms' cost of doing federal government business, could result in the government's being charged higher, not lower, prices. Of course, neither the government nor suppliers will incur significant additional costs of literal compliance if the government does not enforce the questionnaire's disclosure requirements as literally read, or if it enforces the requirements only sporadically. But, a system that lays down a literal rule with which compliance is inordinately difficult, turning nearly everyone into a rule violator, and then permits the agency to pick and -20- 20 choose when and where to enforce the rule, is obviously undesirable. It destroys in practice the very hope of rationally cabining agency discretion that the rulemaking process promises in principle. All this is not to say that the GSA form is unlawful, but, rather, to provide an additional reason why we doubt that a reasonable potential supplier would believe that it was to be taken literally. 3. The Negotiating Context. The GSA negotiator, ________________________ Dewey Carr, gave the DTI negotiator, Elizabeth Bruce, the distinct impression that she did not have to comply with the questionnaire as read literally. He reviewed various pieces of discount information that she provided. He crossed out some of the discount information, for example, discounts offered for sales of more than ten items per order, telling her these discounts were not relevant for the government's purposes. He accepted other pages of material that she supplied, although he knew (and he knew that Ms. Bruce knew that he knew) that they did not contain various discounts that DTI normally offered (but which he considered not relevant to the negotiation). Carr told Bruce specifically that a large discount that DTI gave a large buyer, Digital Equipment Corporation, which purchased particularly large -21- 21 quantities of equipment, was irrelevant because the Government could not commit itself to place an offer of equivalent size. He also gave Ms. Bruce the impression that the words "other discount" on the form referred to discounts applying to the same kind of purchase the Government ________________________ intended to make. He said that the question she should answer was (in the words of his testimony): [F]or the same types of dollar volume that they expect the government to buy in, are there any other commercial customers which have a discounting policy, or do they receive discounts for buying in the same volumes that the government is going to buy in? Although Mr. Carr did say, at one point in his testimony, that he asked Ms. Bruce for "a picture of everything [DTI] did at the time," he simultaneously made clear that Ms. Bruce did not understand his requests to mean that he wanted comprehensive disclosure of the sort Mr. McAndrews described in his testimony. From these three sets of considerations -- the business context, the statutory context, and the negotiating context -- we draw one conclusion, namely, that, whatever the GSA questionnaire writer's subjective intent, its words and requests, considered objectively by a reasonable supplier in the circumstances, did not call for literal -22- 22 compliance. And, we believe that no reasonable juror could have reached a contrary conclusion on the basis of the evidence presented at trial. D A Practical Reading ___________________ If the questionnaire's language is not meant literally, what does it mean? The district court, in directing a verdict, found no stopping point between a literal reading of the questionnaire and unintelligibility. The conflicting testimony of several of the Government's witnesses offers support for the district court's view. But, we need not go as far as the district court. Rather, in reading the record favorably to the Government, we find an alternative, intelligible reading of the questionnaire. Such a reading would call for a "practical" effort to supply _________ relevant price discount data. See Cofman v. Acton Corp., ________ ___ ______ ____________ 958 F.2d 494, 497 (1st Cir. 1992) (contract should be interpreted as a business transaction by practical parties towards a straightforward end). It would require DTI to disclose significantly relevant price discounts that DTI _______________________ normally provided other customers making purchases roughly ________ _______ comparable to the agency purchases the Government __________ contemplated would occur under the MAS program. We do not -23- 23 believe that the record supports an interpretation any more favorable to the Government than this one. And, adopting this kind of interpretation does not help the Government. The trial record makes clear that no jury could reasonably have found a violation of the disclosure obligation as practically interpreted. 1. Special Price Customers. DTI had several _________________________ customers whom it called "Special Price Customers." DTI told GSA that it gave a 30% discount to its largest "Special Price Customer," Digital Equipment Corporation (which discount, GSA told DTI, was not relevant to the MAS negotiations). But, DTI did not tell the GSA about its _____________ other "Special Price Customers," to whom it regularly offered large price discounts. The Government says that DTI should have disclosed this list. The record makes clear, however, that DTI's sales to these "Special Price Customers" were not comparable to the MAS sales DTI proposed to make to government agencies. The President of DTI, Mr. Alfred Molinari, testified that, unlike government agency customers, each "Special Price Customer" provided a special service for DTI in virtue of which it "earned" the discount. Each such customer was a "middleman." A "middleman" computer manufacturer, for -24- 24 example, would install DTI's board in its computer and then sell that computer, thereby reselling DTI's board. A "middleman" software developer, for example, would buy DTI's boards, develop new uses for those boards, and then resell them. A "middleman" engineering firm, for example, would help DTI with quality control problems in addition to reselling boards. Insofar as these firms were "joint venturers" with DTI (helping to develop a better product), they provided DTI with services that the Government would not provide. Insofar as the firms resold DTI's boards, they (unlike the Government) had to "live[] on the discount," buying at a price low enough to permit a profitable resale. In the words of DTI Vice-President Ellen Wirka Harpin, the special price customers, they were offering us something that another, that a regular everyday customer wasn't going to offer us, like advertising, or writing software for our products so the customer could use it, reselling the board . . . . The record contains virtually nothing to contradict these accounts. We must say "virtually nothing" instead of "absolutely nothing" because on redirect examination DTI's President said that one of its special price customers, Sandia Laboratories, in New Mexico, was partly funded by the -25- 25 Government. But, the record tells us nothing further about this example. It tells neither the court, nor a jury, whether Sandia Labs was a "middleman" or "joint venturer," or whether it earned its 12% discount in virtue of those functions or simply because it received the single order "quantity discount" that DTI fully disclosed. The single reference to Sandia Labs, in our view, does not amount to evidence that significantly contradicts the otherwise _____________ undisputed testimony of the DTI executive. And, as we have said, that testimony makes clear that the "special price customer" discounts involved sales so different from MAS sales that DTI need not have disclosed them. 2. The Volume Purchase Agreements. DTI gave a _______________________________ special discount to customers who bought boards pursuant to a "Volume Purchase Agreement" ("VPA"). A VPA, in essence, permitted a signer who bought DTI boards to aggregate a series of small purchases made during the course of a year, and thereby to qualify for a volume discount based on the total amount of boards purchased. The Government makes what are, in essence, two separate claims related to VPA discounts. a. Incomplete Disclosure. DTI gave GSA a blank _____________________ copy of a VPA. That copy makes clear 1) that the buyer -26- 26 signing the VPA must commit to buy a total number of items during the year; 2) that the buyer must send purchase orders for that amount to DTI "within one year;" 3) that the buyer must "accept delivery of the products ordered within fourteen months;" and, 4) that if the year's purchase orders exceed, or fall short of, the amount of the initial commitment, DTI will adjust the discount accordingly. A government auditor testified that GSA considered this type of VPA (with its discount "bill back" provision for purchase shortfalls) "as being identical to MAS-type contracts." For that reason, the Government apparently claims that DTI should also have given it a list of its VPA customers and copies of the actual contracts with these customers as well as the blank form. That added information, in the Government's view, presumably would have permitted the GSA negotiator more easily to recognize the "aggregation" feature of the VPA agreement, and, perhaps, to have negotiated a similar discount for government agencies. The record makes clear, however, that the questionnaire (as interpreted practically) did not oblige DTI to provide this additional information, for, as we just said, DTI gave the GSA a blank VPA form contract and, that being so, an additional filled out form would have added -27- 27 nothing of significance. For one thing, the VPA agreement is not, and could not reasonably seem "identical to MAS-type contracts." In fact, it is different enough that DTI could reasonably have thought that Mr. Carr did not need every VPA detail. GSA's negotiator, Mr. Carr, testified that he told the DTI negotiator, Ms. Bruce, that the VPA discount was not ___ relevant to the MAS negotiation because the "government cannot commit to buy any amount during any period of time." The VPA form itself makes clear that a buyer must do the contrary, that is, the buyer must say that it wishes to purchase the quantities set forth in Exhibit A hereto (the 'Quantity Levels') of the products described in Exhibit A (the 'Products'). This would seem to be the kind of promise (whether or not the VPA assessed penalties for its breach) that Mr. Carr had in mind when he testified that GSA "cannot sign up to an agreement like this." For another thing, DTI's President testified (without contradiction) that VPA sales, unlike MAS sales, involved billing and servicing a single VPA buying source. In contrast, MAS sales, he said, meant separate invoices for every facility. It meant separately answering questions from every researcher as to how to use our product, and then separate manuals going out with each -28- 28 product. It was indeed like selling to hundreds of different customers. In no way did it have any amalgamation of saving money or making it a more efficient sale. This point, that MAS purchases would not involve economies of scale enabling DTI to charge a lower price, is particularly significant because DTI's MAS sales would involve federal agency purchases of no more than ten units at a time from DTI. GSA told all agencies intending to buy larger amounts not to buy through the MAS program, but rather to negotiate ___ directly with DTI for a better discount. We do not see how anyone, in the circumstances, could conclude that providing GSA with filled out forms instead of a blank form would have added something of significance to the disclosure. b. Inaccurate Disclosure. The Government points _____________________ out that Mr. Carr testified at trial that Ms. Bruce told him that a VPA buyer qualified for a discount only if the buyer bought all the VPA items using a single purchase order at a ___ ____ single time. Ms. Bruce strongly denied saying this; ____________ Mr. Carr's contemporaneous notes of the negotiations reflect no such statement; Mr. Carr did not recall the statement when he gave a deposition; and the record contains no -29- 29 corroborating evidence. Nonetheless, we concede that a reasonable jury might believe Mr. Carr's trial testimony. And, in that case, it could believe that Ms. Bruce told Mr. Carr something that was not true, for the VPA contract permitted VPA buyers to aggregate different purchases made ___________________ at different times during the year through different ________________ __________________ purchase orders. _______________ The jury, nonetheless, could not predicate liability on this belief, for (to return to the contract's "Defective Pricing Clause") the jury could not reasonably conclude that Ms. Bruce's alleged statement to Mr. Carr could have "increased [prices] by" a "significant amount." Mr. Carr was fully aware that Ms. Bruce was nineteen years old, was not an expert on company pricing policy, and did not fully understand the complex forms or documents. At the same time, he had before him the VPA contract itself, which quite clearly provides for aggregation of purchase orders over the period of a year. He had read the DTI catalogue which distinguishes between "quantity discounts" available "when placed in a single order," and "other" discounts _________________________________ _____ available on a "contract basis." And, he must have known that Ms. Bruce's (alleged) statement made little sense, for it would have meant that VPA customers had to sign contracts -30- 30 to obtain the same discounts that any other customer could obtain just by placing a large single order. Given these circumstances, Mr. Carr's negligence in relying upon such a statement, not the statement itself, would have been the predominant cause of any resulting higher price. See Atari ___ _____ Corp. v. Ernst & Whinney, 1992 U.S. App. LEXIS 32,243 at *16 _____ _______________ (9th Cir. 1992) (where plaintiff possesses facts showing representations to be false, reliance unreasonable and precludes determination that misrepresentations caused injury); cf. United States v. Lumbermen's Mutual Casualty ___ _____________ ____________________________ Co., 917 F.2d 654, 660-61 (1st Cir. 1990) (reliance on ___ statements unreasonable when party should have known they were incorrect); Paper Express, Ltd. v. Pfankuch Maschinen, ___________________ ___________________ G.M.B.H., 972 F.2d 753, 757-58 (7th Cir. 1992) (where ________ sophisticated party could read document itself, reliance on other party's representations concerning document's content unreasonable). That being so, the jury could not have found a violation of the "defective pricing" clause, for we do not read that clause to predicate liability where GSA, rather than the supplier, is primarily at fault. For these reasons, we conclude that DTI was legally entitled to a directed verdict on the Government's -31- 31 "defective pricing" clause contract claim. We add that the district court also directed a verdict in DTI's favor on various other contract-related claims -- for "unjust enrichment" and "payment by mistake." We affirm the verdicts on those counts, for our analysis of the contract claim precludes a jury verdict for the Government on these claims as well. II The False Claims Act Jury Instruction _____________________________________ The Government also charged DTI with having violated the False Claims Act, an act that prohibits a person from "knowingly present[ing] . . . a false or fraudulent claim for payment . . . . " 31 U.S.C. 3729(1)(1982), replaced by 31 U.S.C. 3729(a) (1986). In ___________ the Government's view, DTI's failure completely and accurately to disclose price discount information made all of its subsequent payment requests "false" and "fraudulent," for these requests rested upon an assertion that the relevant underlying data were accurate and complete. The jury found in DTI's favor. The Government appeals. The Government argues at length that the court improperly instructed the jury about the state of mind -32- 32 necessary to support a False Claims Act violation. In the Government's view, the requisite state of mind includes, not only 1) a specific intent to deceive, but also 2) "deliberate ignorance of the truth," and 3) "reckless disregard of the truth." The Government concedes that these two last mentioned states of mind made their first legal appearance when Congress amended the False Claims Act in 1986. See 31 U.S.C. 3729(b). Before that time, the law ___ was as the district court stated it. Yet, says the Government, Congress intended its new statutory standard to apply retroactively, to actions that, as here, took place long before 1986. The Sixth Circuit has considered this issue at length. It has concluded that the new standard is not retroactive. See United States v. Murphy, 937 F.2d 1032, ___ _____________ ______ 1038 (6th Cir. 1991) (False Claims Act intent standard does not apply retroactively since it enlarges scope of substantive liability under the Act). We find its reasoning convincing. And, we would follow its holding. We need not decide the matter definitely, however, for, given our decision thus far, it is clear that any error was "harmless." For the reasons set out above, the record would not support a verdict for the Government, irrespective -33- 33 of the instruction on state of mind. The GSA form cannot reasonably be interpreted to require, in the circumstances, disclosure of the "Special Price Customer" or "VPA" information beyond the disclosure DTI actually made. Hence, DTI's alleged nondisclosure could not have been material to the price negotiated. See, e.g., United States v. Klein, ___ ____ _____________ _____ 230 F.Supp. 426, 432 (W.D.Pa. 1964) (fraud implies the misrepresentation of a material fact); Turner v. Johnson & ______ _________ Johnson, 809 F.2d 90, 95 (1st Cir. 1986) (materiality _______ established as an element of common law fraud). For these reasons, the judgment of the district court is Affirmed. ________ NOTE: See Slip Opinion for Appendix. -34- 34