Don FLEMING, d/b/a Green Valley Feed Mill, Appellant,

v.

UNITED STATES of America, Appellee.

No. 7591.

United States Court of Appeals Tenth Circuit.

Sept. 3, 1964.

Leland S. Sedberry, Jr., Albuquerque, N. M. (Modrall, Seymour, Sperling, Roehl & Harris, Albuquerque, N. M., on the brief), for appellant.

John A. Babington, Asst. U. S. Atty. (John Quinn, U. S. Atty., on the brief), for the United States.

Before PHILLIPS and LEWIS, Circuit Judges, and CHRISTENSEN, District Judge.

ORIE L. PHILLIPS, Circuit Judge.

The United States brought this action against Fleming upon a claim of the Commodity Credit Corporation to recover damages and forfeitures under the False Claims Act, 31 U.S.C.A. § 231 et seq. Trial was had to the court without a jury, at the conclusion of which the court found that Fleming knowingly and with intent to defraud made and presented to the Commodity Credit Corporation 15 false, fictitious and fraudulent claims. Judgment was accordingly entered against Fleming for double damages in the amount of $792.40 and for forfeitures of $2,000 for each of the 15 false, fictitious and fraudulent claims. Fleming has appealed.

Fleming operated a feed mill in Tucumcari, New Mexico, under the name of Green Valley Feed Mill. In 1956, he was a certified dealer under the Emergency Feed Program and had entered into Feed Dealers Agreements with the Commodity Credit Corporation.

Under the Emergency Feed Program, farmers made application for emergency feed to their County A.S.C. Committee. If a farmer was determined to be eligible for assistance by the County Committee, he was issued a Farmers Purchase Order for a specified amount of designated surplus feed grain, which the farmer then transferred to a certified dealer as a part of the purchase price of the designated surplus feed grain. The dealer, within 30 days, then presented such Purchase Order, or Orders, received by him to the County Committee in exchange for a Dealers Certificate in a face value equal to the value of the Purchase Order, or Orders, presented, with which the dealer could then purchase designated surplus feed grain owned by the Commodity Credit Corporation.

Before the dealer presented a Purchase Order to the County Committee, he was required to execute a certification contained in the Purchase Order, which provided as follows:

"SECTION III. CERTIFICATION BY DEALER—RECORD OF PURCHASE.

"(a) I certify that I have sold and actually delivered to the above-named farmer the designated surplus feed grains * * * as shown in the table below * * *.

"(b) I certify that I have accepted the transfer of this Purchase Order in part payment for the quantity of designated surplus feed grains * *

as shown in the table below to the full extent of the value, as specified in Column (C) of such table, for each hundredweight so shown.

\* \* \* \* \* \*

"(d) I certify with respect to this Purchase Order that I have fully complied with all of the provisions of Section 2 of the 'Feed Dealer's Agreement—1955 Emergency Feed Program,' and that I am entitled under the terms and conditions of such Agreement to present this Purchase Order as the basis for issuance of a Dealer's Certificate."

Part 2 of the Feed Dealers Agreement —1955 Feed Program provides in part as follows:

\* \* \* \* \* \*

"b. The Dealer must have accepted the transfer of the Purchase Order in part payment for the quantity of designated surplus feed grains \* \* listed in the table set forth in Section III of the Purchase Order to the full extent of the value, as specified below, for each hundredweight so listed, up to the maximum value of the Purchase Order. The Dealer must have sold and actually delivered to the farmer the quantity of designated surplus feed grains \* \* \* listed in such table and the Purchase Order must have been issued prior to the date on which such designated surplus feed grains \* \* \* were delivered to the farmer. The maximum total value of any Purchase Order shall be an amount equal to the number of hundredweight shown in Section I of the Purchase Order multiplied by $1.00."

The evidence showed that on 15 occasions from April 11, 1956, through July 14, 1956, Fleming accepted Purchase Orders from farmers in the Tucumcari area; gave them a credit on his books for the value of the Purchase Orders, but did not deliver the grain for which the Purchase Orders were redeemed; caused to be executed the Purchase Orders Dealers Certifications; presented such Purchase Orders with invoices at-

tached showing that the farmer had purchased and received a quantity of grain, the charge therefor, less the value of the purchase order, to the County Committee; received Dealers Certificates therefor; and negotiated such Dealers Certificates.

In 1955, Fleming had hired a manager for his feed business, who had had experience with the Emergency Feed Program. Such manager set up the bookkeeping system used in handling Farmers Purchase Orders, but Fleming was aware of the manner in which the Purchase Orders were being handled.

Fleming testified that over half of the Purchase Orders redeemed by him were sent to him by mail by the farmers to whom they had been issued; that such farmers did not like the feed mixtures which could be purchased with the Purchase Orders and requested him to provide them with mixtures different from those called for by the Purchase Orders; and that his manager therefore devised the arrangement described above, whereby a farmer was given a general cash credit for the value of his Purchase Order, but was not then charged for any grain. At a later time, when the farmer took delivery of a quantity of feed of his specified mixture, the value thereof was debited to his account.

In all except one of the 15 transactions referred to above, grain of some kind, but not established to be designated surplus feed grain, was ultimately delivered to the farmers who had redeemed their Purchase Orders with Fleming, but some of such deliveries were not made until Fleming had been convicted of a criminal offense arising out of the same transactions, and had been placed on probation conditioned upon his delivery of such grain. In one instance a farmer refused to accept Fleming's delivery of such grain, valued at $396.20.

The court found that the 15 Purchase Orders were signed on behalf of Fleming, with his knowledge, when Fleming knew that he had not delivered the designated surplus grain; that Fleming knew that he had not accepted the Purchase Orders

in part payment for the feed indicated on the Purchase Order; that the invoices attached to the Purchase Orders were false and fictitious and known to Fleming to be false and fictitious, in that there had been no purchase of any quantity of feed by the individual named, on the date and in the amounts listed on the invoices; that a credit was given to the account of the person named in the Purchase Order, but such account was not charged with the amount of grain indicated on the invoice; that Fleming submitted the false Purchase Orders with the intent to deceive and defraud the United States and to cause the issuance of Dealers Certificates; that the County Committee issued Dealers Certificates to Fleming because of the false representations made by him or on his behalf; and that Fleming endorsed or caused to be endorsed the Dealers Certificates and received value therefor.[1]

The court made no finding as to damages, but concluded that "Pursuant to the provisions of Title 31 U.S.C. 231, the plaintiff is entitled to double the damages sustained as a result of the Hubert Beasley claim which was in the amount of $396.20, for a total of $792.40."

The sole contention raised by Fleming is that the United States, in order to establish its case under the False Claims Act, must prove all the elements ordinarily required in an action for damages for fraud, and that since the United States did not do so, the court erred in entering judgment for the United States. We are of the opinion that the meaning of the portion of the Act applicable to Fleming is clear and unambiguous and contains no such requirement.

Section 31 of the False Claims Act, 31 U.S.C.A. § 231 et seq., provides as follows:

"Any person not in the military or naval forces of the United States, or in the militia called into or actually employed in the service of the United States, *who shall make or cause to be made, or present or cause to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, any claim upon or against the Government of the United States, or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent,* or who, for the purpose of obtaining or aiding to obtain the payment or approval of such claim, makes, uses, or causes to be made or used, any false bill, receipt,

1. After the court's findings of fact and conclusions of law were filed, a further hearing was held and the court made certain oral statements, in pertinent part, as follows:

"* * * In order that there will be no misunderstanding of the feeling of the Court in the matter, I wish to dictate certain things into the record and they may be considered as modifications of the Court's findings if the Court's findings are in conflict with what I am about to say.

"* * * I felt, after hearing the evidence, that the defendant intended to do exactly what he did; namely, he turned into the government agencies certificates reciting that he had delivered eligible feed to customers when, in fact, he had not delivered such feed at that time but had credited the customers' accounts with the proper amount of cash credit. That later he delivered feedstuffs of some kind to all of the customers except Mr. Beasley, who refused to receive any feedstuffs; that this feedstuff which he actually delivered was not eligible feed under the program but was such feed or mixtures as the customers may have ordered.

* * * * *

"* * * My feeling was that judgment should be for the Government, because he certified to something that was not true and correct, in that he certified that he had delivered eligible feeds when, in truth and in fact, he had at that time not delivered any feed and thereafter didn't deliver the eligible feeds but did deliver other feeds that the customer may have ordered.

* * * * *

"There is no question that he had not delivered the feed and that the certificates were false, because he had not delivered the feeds that he certified he had delivered."

voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry, or who enters into any agreement, combination, or conspiracy to defraud the Government of the United States, or any department or officer thereof, by obtaining or aiding to obtain the payment or allowance of any false or fraudulent claim, or who, having charge, possession, custody, or control of any money or other public property used or to be used in the military or naval service, who, with intent to defraud the United States or willfully to conceal such money or other property, delivers or causes to be delivered, to any other person having authority to receive the same, any amount of such money or other property less than that for which he received a certificate or took a receipt, and every person authorized to make or deliver any certificate, voucher, receipt, or other paper certifying the receipt of arms, ammunition, provisions, clothing, or other property so used or to be used, who makes or delivers the same to any other person without a full knowledge of the truth of the facts stated therein, and with intent to defraud the United States, and every person who knowingly purchases or receives in pledge for any obligation or indebtedness from any soldier, officer, sailor, or other person called into or employed in the military or naval service any arms, equipments, ammunition, clothes, military stores, or other public property, such soldier, sailor, officer, or other person not having the lawful right to pledge or sell the same, shall forfeit and pay to the United States the sum of $2,000, and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing such act, together with the costs of suit; and such forfeiture and damages shall be sued for in the same suit." (Emphasis supplied.)

The first portion of the Act, that which the United States claims Fleming violated, provides for liability in the event of a "false, fictitious or fraudulent" claim. By the use of the disjunctive "or" Congress made it clear that any one of the three wrongful types of claim would subject the claimant to liability and that the claim need not be "fraudulent" so long as it is "false."

Further, it should be noted that the Act provides for six different eventualities which will give rise to liability for a $2,000 forfeiture and double damages: (1) Presenting a claim upon the Government, knowing it to be false; (2) using a document known to contain a fraudulent statement or entry to obtain the payment or approval of a claim; (3) conspiring to defraud the United States by obtaining the payment of a false or fraudulent claim; (4) delivering military money or property less than that for which a receipt is received, with intent to defraud or conceal; (5) delivering a receipt for property without a full knowledge of the truth of the facts stated therein, with intent to defraud the United States, and (6) purchasing or receiving in pledge property from a member of the military forces, knowing that such person does not have the lawful right to pledge or sell such property.

Only the third and fifth of such eventualities contains the element of fraud or intent to defraud as an absolute, rather than an alternative element. Had Congress intended to incorporate fraud or intent to defraud into each portion of the Act, it is unlikely that it would have done so expressly in two portions and not in the remaining portions.

Moreover, where a person files a claim, which he knows is false, for the purpose of obtaining approval or payment of the claim, we think there is a reasonable inference, almost a necessary implication, that he intends to deceive.

The trial court here found an intent to deceive and the evidence sustains that finding.

**480**

■ Proof of damage to the Government resulting from a false claim is not a necessary part of the Government's case under the Act.[2] If damage is proved by the Government, as it was in the instant case as to one of Fleming's false claims, it is entitled to recover double the amount so proved in addition to the $2,000 forfeiture, but upon adequate proof of the making of a claim upon the Government, knowing it to be false, the United States is entitled, without proof of damage, to recover the forfeiture.

Under the first portion of § 231 it is necessary only that the claimant made a claim upon or against the Government of the United States, knowing it to be false, in order to incur liability.

Fleming caused the 15 Farmers Purchase Orders to be presented to the County Committee for the purpose of obtaining Dealers Certificates, which were valuable pieces of property, and in our opinion such Purchase Orders were claims as contemplated by the False Claims Act.[3] And the Commodity Credit Corporation is a part of the "Government of the United States" for purposes of the Act.[4]

■ The fact that Fleming caused 15 Purchase Orders to be filed, knowing that the statements contained therein that the feed had been "actually delivered" to the purchaser were false, is uncontroverted and Fleming does not contend otherwise. Thus, the United States proved, and the court below found all the facts necessary to establish Fleming's liability for forfeitures for 15 violations of the Act and for double the damages suffered by the United States as the result of one of such claims.

The judgment is affirmed.

---

2. Toepleman v. United States, 4 Cir., 263 F.2d 697, 699, c.d. 359 U.S. 989, 79 S.Ct. 1119, 3 L.Ed.2d 978; United States v. American Precision Products Corp., D.C.N.J., 115 F.Supp. 823, 827, 828; See also: Berenbeim v. United States, 10 Cir., 164 F.2d 679, 683, c.d. 333 U.S. 827, 68 S.Ct. 454, 92 L.Ed. 1113.

3. Sell v. United States, 10 Cir., 336 F. 2d 467; United States v. Borth, 10 Cir., 266 F.2d 521, 523; United States v. McNinch, 356 U.S. 595, 599, 78 S.Ct. 950, 2 L.Ed.2d 1001.

4. Sell v. United States, 10 Cir., 336 F.2d 467; Rainwater v. United States, 356 U.S. 590, 592, 78 S.Ct. 946, 2 L.Ed.2d 996.