UNITED STATES of America, Appellant,

v.

TDC MANAGEMENT CORPORATION, INC.; Conrad T. Monts, Appellees.

No. 92–5369.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 31, 1994.

Decided June 3, 1994.

Paul D. Scott, Atty., U.S. Dept. of Justice, Washington, DC, argued the cause for appellant. With him on the briefs were Eric H. Holder, U.S. Atty., Douglas N. Letter and Michael F. Hertz, Attys., U.S. Dept. of Justice, Washington, DC. Ronald H. Clark, Washington, DC, entered an appearance.

Dennis F. Nee, Washington, DC, argued the cause for appellee. With him on the brief was Peter L. Goldman, Washington, DC.

Before MIKVA, Chief Judge, WALD and EDWARDS, Circuit Judges.

Opinion for the Court filed by Chief Judge MIKVA.

Opinion dissenting in part filed by Circuit Judge WALD.

MIKVA, Chief Judge:

TDC Management Corporation ("TDC") entered into a cost-reimbursement contract with a federal agency to implement a Demonstration Bonding Program pairing minority business enterprises with private investors. When the Program failed to progress as expected, the agency terminated it for convenience and disallowed $441,972 of the $928,916 TDC claimed as contract-related expenditures. Appellees, TDC Management Corporation and its President, appealed these cost disallowances to the Department of Transportation Board of Contract Appeals ("DOTBCA" or "Board"). Before DOTBCA rendered its verdict, the United States brought suit in district court alleging that TDC violated the False Claims Act by misrepresenting in monthly reports its actual progress implementing the Program.

The Board held that appellees were entitled to cost-reimbursements in all cost categories that the agency sought to disallow and that appellees had not breached the contract for nonperformance. Based on the collateral estoppel effect of the Board's findings, appellees moved for summary judgment in district court on the government's False Claims Act claim. The district court granted TDC's motion. We now affirm in part and reverse in part.

## I. Background

TDC Management Corporation contracted with the Urban Mass Transportation Administration ("UMTA"), an instrumentality of the Department of Transportation, to implement and administer a Program assisting minority business enterprises ("MBEs") in securing bonding from sureties when bidding on large transportation construction projects. Specifically, TDC agreed to seek out private investors willing to contribute management assistance and up to $3 million in collateral to the MBEs in return for a percentage of the profits on construction projects. UMTA was to match the collateral that investors contrib-

uted. By the terms of the Program, TDC was to serve as an ombudsperson between the parties, with no financial interest in Program operations.

Pursuant to its contract with UMTA, TDC submitted monthly progress and expenditure reports to UMTA. UMTA reimbursed TDC monthly for documented expenditures. The government claims that TDC's reports overstated its progress in attracting investors and failed to disclose that, contrary to the Program design, TDC sought to obtain a financial interest in Program operations. The government claims that UMTA would not have made payments to TDC had it been aware of either of these facts.

UMTA first learned of TDC's alleged misrepresentations in December 1984. On April 5, 1985, it issued a termination for convenience. UMTA had, to that point, paid TDC $747,944 for contract-related expenditures. On June 1, 1985, TDC submitted a termination settlement proposal seeking an additional $216,133 in contract reimbursements. In May 1986, a UMTA contracting officer held that only $486,944 of the total $928,916 claimed by TDC over the life of the contract were "allowable, allocable, and reasonable." The officer categorically disallowed TDC's undocumented travel costs, computer costs, excessive per diem charges, cost overruns, and costs associated with TDC's Los Angeles office. The officer requested that TDC reimburse UMTA for the $261,615 overpayment that TDC had already received.

TDC appealed the contracting officer's decision to DOTBCA, claiming that it was entitled to an additional $143,852 in cost-reimbursements from UMTA plus $9,830 in termination costs. UMTA raised three affirmative defenses to TDC's claims: (1) TDC failed to perform the tasks in the contract statement of work; (2) TDC obtained the contract "by fraud and misrepresentation"; and (3) TDC "perpetrated frauds ... in presenting vouchers for payment of costs claimed" under the contract. UMTA also filed a counterclaim, grounded in restitution and breach of contract, seeking recovery of all contract payments already made to TDC.

Pursuant to the Contract Dispute Act of 1978, 41 U.S.C. § 605, the Board held that its jurisdiction extended only to those costs that the contracting officer had disallowed. As such, the Board would not consider UMTA's claim that TDC was not entitled to any monies under the contract. Nonetheless, the Board would consider "any applicable reason for disallowance [of costs the contracting officer denied] regardless of whether or not such reason was stated in the Contracting Officer's decision."

On October 15, 1987, the government moved to suspend DOTBCA's contract dispute proceeding pending conclusion of a Department of Justice criminal investigation into possible fraud charges against TDC. DOTBCA granted this motion and stayed its proceedings until February 1, 1988. The government ultimately declined to file criminal fraud charges against TDC but, on May 26, 1989, it filed a civil action under the False Claims Act and the common law alleging that TDC knowingly submitted false progress reports to UMTA. The government claimed that TDC's monthly progress reports misrepresented its actual progress in attracting investors and sureties willing to participate in the Demonstration Bonding Program and concealed TDC's substantial deviations from agreed-upon Program terms.

Claiming that DOTBCA lacked jurisdiction to hear cases involving issues of fraud, the government moved to suspend the Board's contract dispute proceedings until the conclusion of the government's civil suit against TDC. The Board recognized that its jurisdiction, as defined by the Contract Dispute Act of 1978, did not extend to "settl[ing], compromis[ing], pay[ing] or otherwise adjust[ing] any claim involving fraud." 41 U.S.C. § 605(a). Nonetheless, the Board denied the government's motion and announced that it would "proceed in accordance with its statutory jurisdiction, to ascertain the amounts of costs incurred which were allocable to [the] contract and were reasonable." The Board recognized that this determination "may well have collateral effect beyond the categories of costs addressed in the Contracting Officer's decision." Nonetheless, the Board assumed that the district court would

"proceed in accordance with its statutory jurisdiction to ascertain whether TDC wilfully submitted false progress reports."

After an administrative trial, the Board invalidated UMTA's categorical cost disallowances of TDC's reimbursement claims finding that TDC's monthly progress reports had notified UMTA of the very categories and types of expenditures that UMTA later sought to disallow. In addition, the Board held that TDC had not breached its contract through nondelivery of the end product. The United States Court of Appeals for the Federal Circuit affirmed the Board's ruling. *Skinner v. TDC Management Corp.*, 975 F.2d 869 (Fed.Cir.1992). Based on the collateral estoppel effect of the Board's decision, TDC moved for summary judgment in the government's False Claims Act case against TDC. The district court granted TDC's motion and this appeal followed.

## II. Discussion

### A. Collateral Estoppel

 If a disputed issue of fact was "actually litigated and necessarily decided by a final disposition on the merits" in a prior litigation between the same parties, the parties are collaterally estopped from relitigating that issue in a subsequent proceeding. *Nat'l Post Office Mail Handlers v. American Postal Workers*, 907 F.2d 190, 192 (D.C.Cir. 1990). A party may be collaterally estopped by administrative as well as judicial determinations. *See Paramount Transport Systems v. Chauffeurs, Teamsters & Helpers*, 436 F.2d 1064 (9th Cir.1971). We review *de novo* the district court's determination that the Board's factual findings collaterally estop the government's False Claims Act claim.

### 1. False Progress Reports

██ UMTA claimed before the Board that TDC was not entitled to payment under the contract because TDC had breached its contract with UMTA through "nondelivery of the end product." The Board found, however, that the UMTA contract was a "best efforts" contract "obligating [TDC] to perform its best efforts to locate investors and sureties and obtain their tentative agree-

ment" to participate in the Demonstration Bonding Program. As such, UMTA's breach of contract claim turned on whether TDC made a good faith effort to produce an operational program, not on whether those efforts proved successful.

TDC's monthly progress reports summarize TDC's efforts to implement the Demonstration Bonding Program. Based on the record before us, those reports are the only account of TDC's progress and setbacks in implementing the Program. Thus, the Board could not have ruled that TDC "made substantial progress towards producing an operational Program," without crediting the veracity of TDC's reports. Because the Board implicitly found that TDC's monthly reports accurately reflected TDC's Program progress, the government is collaterally estopped from relitigating the accuracy of those reports in its False Claims Act claim.

### 2. Financial Stake in Program Operations

■ The government's False Claims Act suit also includes a claim that TDC fraudulently omitted from its monthly progress reports information concerning TDC's unauthorized financial stake in Program operations. The Board characterized these omissions as "intentional" and found that they were "intended to keep UMTA from learning of activities which UMTA would insist be terminated." However, the Board held that these omissions "did not constitute a sound legal basis for disallowance of costs" because UMTA failed to prove that these acts "were the cause of the Program never becoming operational on this contract."

The Board expressly reserved for the district court the legal determination of whether TDC's failure to report its financial stake in Program operations constituted fraud. Nonetheless, TDC argues, and the district court apparently found, that the Board's "impression that UMTA may never have read the reports" precludes the government from establishing a critical element of its False Claims Act claim—UMTA's reliance on TDC's monthly progress reports. We disagree.

In disposing of TDC's contract claim, the Board made no necessary findings about UMTA's reliance on TDC's reports. Rather, the Board found that UMTA tacitly approved of TDC's reported expenditures and activities by accepting TDC's monthly reports without comment. Thus, whether UMTA ignored or relied on TDC's reports was of no consequence insofar as TDC's contract claim was concerned. Consequently, the Board's finding that UMTA tacitly accepted items *contained* in TDC's progress reports does not collaterally estop the government from bringing a False Claims Act claim based on information that TDC *omitted* from the reports.

In sum, because DOTBCA credited the veracity of TDC's monthly progress reports in rejecting the government's breach of contract claim, we hold that the government is collaterally estopped from relitigating whether TDC's monthly reports misrepresented TDC's actual progress implementing the Demonstration Bonding Program. However, DOTBCA's determination that UMTA tacitly assented to the activities and expenditures *contained* in TDC's monthly reports does not collaterally estop the government from bringing a False Claims Act claim based on information TDC *omitted* from those reports.

### B. "Knowingly" within the meaning of the False Claims Act

The False Claims Act provides that a party who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved" is subject to liability. 31 U.S.C. § 3729(2) (1982). The district court interpreted this provision to require proof that TDC "knowingly or recklessly" made false or fraudulent statements "with the intent to deceive the government concerning the validity of the claim against it." The government argues that the district court articulated too stringent a standard of liability under the Act. We agree. To satisfy the False Claims Act's knowledge requirement, the government need not prove that TDC had an intent to deceive when it knowingly or recklessly made false statements to the government.

### 1. Intent to Deceive

■ The Fifth, Ninth and Eleventh Circuits hold that, prior to 1986, the False

Claims Act required proof that a defendant acted with the intent to deceive the government. *See United States v. Davis*, 809 F.2d 1509, 1512 (11th Cir.1987); *United States v. Aerodex, Inc.*, 469 F.2d 1003, 1007 (5th Cir. 1972); *United States v. Mead*, 426 F.2d 118 (9th Cir.1970). The Eleventh Circuit so held because the intent to deceive is a requisite element of common law fraud and "'[n]o statute is to be construed as altering the common law, farther than its words import.'" *Davis*, 809 F.2d at 1512 citing *Shaw v. Railroad Co.*, 101 U.S. 557, 565, 25 L.Ed.2d 892 (1987). The Ninth Circuit simply could not believe that Congress "intended to catch the hapless with the heavy penalties which may be imposed under the False Claims Act." *Mead*, 426 F.2d at 121. (While citing *Mead* as governing law in the circuit, the Ninth Circuit did later state that the government's burden under the False Claims Act "was to prove that [the defendant] caused false claims to be filed with knowledge that the claims were false." *United States v. Ehrlich*, 643 F.2d 634, 637–38 (9th Cir.), *cert. denied*, 454 U.S. 940, 102 S.Ct. 474, 70 L.Ed.2d 247 (1981)).

The Seventh, Eighth and Tenth Circuits, along with the Court of Claims, hold that an intent to deceive is not necessarily a requisite element of proof under the pre–1986 Act. *See United States v. Hughes*, 585 F.2d 284, 287–88 (7th Cir.1978); *Miller v. United States*, 550 F.2d 17, 23, 213 Ct.Cl. 59 (1977); *United States v. Cooperative Grain and Supply Co.*, 476 F.2d 47, 56–8 (8th Cir.1973); *Fleming v. United States*, 336 F.2d 475, 479 (10th Cir.1964), *cert. denied*, 380 U.S. 907, 85 S.Ct. 889, 13 L.Ed.2d 795 (1965). The Act's legislative history supports this view.

In 1982, Congress recodified the False Claims Act to substitute, "without substantive change, ... simple language ... for awkward and obsolete terms." See H.R.Rep. No. 651, 97th Cong., 2d Sess. 1, reprinted in 1982 U.S.C.C.A.N. 1895, 1895. Before this recodification, the False Claims Act forbade knowing presentation of a "false, fictitious, or fraudulent claim." 31 U.S.C. § 231 (1976). In recodifying the Act, Congress eliminated the word "fictitious" but retained both "false" and "fraudulent" as part of the statutory language. 31 U.S.C. § 3729 (1982). We infer from this that Congress distinguished "false" from "fraudulent" claims and presume the distinction to turn on whether the defendant acted with an intent to deceive. Accordingly, we conclude that the intent to deceive is a requisite element of proof under the pre–1986 Act only if the government asserts that a defendant submitted "fraudulent" as opposed to "false" claims to the government.

2. Actual Knowledge vs. Reckless Disregard

■ The circuits are also split on whether the False Claims Act formerly required proof that a defendant had "actual knowledge" of the falsity of his claims. The First, Sixth, and Tenth Circuits require such proof but the Eighth Circuit and the Court of Claims construe "knowing" more broadly for purposes of the pre–1986 Act. *See United States of America v. Data Translation, Inc.*, 984 F.2d 1256, 1266 (1st Cir.1992); *United States v. Murphy*, 937 F.2d 1032, 1038 (6th Cir.1991); *Miller v. United States*, 550 F.2d 17, 23, 213 Ct.Cl. 59 (1977); *United States v. Cooperative Grain and Supply Co.*, 476 F.2d 47, 60 (8th Cir.1973); *Fleming v. United States*, 336 F.2d 475, 480 (10th Cir.1964); *cert. denied*, 380 U.S. 907, 85 S.Ct. 889, 13 L.Ed.2d 795 (1965). Although this circuit had not decided the issue prior to the passage of the 1986 amendments, the Act's broad, remedial purpose and civil as opposed to criminal nature persuade us that the statute's knowledge requirement has always encompassed more than "actual knowledge." To construe the Act more narrowly would readily permit parties to evade liability through deliberate ignorance or careless disregard of the accuracy and veracity of their claims. We do not believe Congress so intended. Accordingly, we hold that a party "knowingly" presented false or fraudulent claims to the government if he had "actual knowledge" or acted with "deliberate ignorance" or "reckless disregard" of the truth or falsity of his claims.

3. Retroactivity of 1986 Amendments

Congress amended the False Claims Act in 1986 to clarify that defendants were subject

to liability under the Act if they had "actual knowledge" of the falsity of their claims or acted with "deliberate ignorance" or "reckless disregard" of the truth or falsity of their claims. 31 U.S.C. § 3729(b). The 1986 amendments expressly provided that "no proof of specific intent to defraud is required" to satisfy the Act's knowledge provisions. *Id.* The government claims that these amendments warrant retroactive application because they merely clarify the preexisting standard of liability under the Act; no "new" law is at issue. Because we interpret the False Claims Act to comport with the 1986 amendments, we need not reach the government's retroactivity claim.

### III. Conclusion

■ To prevail under the False Claims Act, the government must prove either that TDC actually knew it had omitted material information from its monthly progress reports or that it recklessly disregarded or deliberately ignored that possibility. The government need not prove that TDC intended to deceive the government by omitting such information. The amendments' civil penalty and treble damages provisions clearly expand the potential scope of liability under the Act. Neither the plain language nor the legislative history of the amendments requires retroactive application of these provisions. *See Bowen v. Georgetown University Hospital,* 488 U.S. 204, 208, 109 S.Ct. 468, 471–72, 102 L.Ed.2d 493 (1988). Accordingly, the civil penalty and double damages provisions of 31 U.S.C. § 3729 (1982) govern any damage award that ensues from the government's False Claims Act suit against TDC. Any such damage award would merely offset the payments to which the Board of Contract Appeals has already determined TDC is entitled under the terms of its UMTA contract.

*Affirmed in part and reversed in part.*

WALD, Circuit Judge, dissenting in part:

I agree with my colleagues that the doctrine of collateral estoppel does not prevent the United States from pressing its claim that TDC failed to divulge its own financial stake in program operations. Moreover, I agree that the proper standard of liability under the pre–1986 False Claims Act reaches deliberate ignorance and reckless disregard, as well as actual knowledge. But I also believe that the Board's findings do not collaterally estop the United States from asserting that TDC's monthly progress reports falsely or fraudulently misrepresented their actual progress. The Board's conclusion that TDC made substantial progress on its contract does not, to my mind, "actually and necessarily" establish that TDC's numerous progress reports were entirely accurate. *Yamaha Corp. v. United States,* 961 F.2d 245, 254 (D.C.Cir.1992).

After finding that the contract imposed only a "best efforts" requirement on TDC, the Board concluded that "TDC had made substantial progress towards producing an operational Program which, while it contained variations from the Demonstration Bonding Program produced under the earlier Contract, was not such a gross departure as to vitiate all TDC's efforts." This conclusion, essentially that TDC had substantially performed its obligations under the contract (or had not, in any event, committed a "gross departure"), is not inconsistent with a finding that TDC may have misrepresented its progress in reports to UMTA. The "flexible requirement of substantial performance stands in sharp contrast to the requirement of strict compliance." E. ALLAN FARNSWORTH, CONTRACTS § 8.12, at 415 (1990). Almost definitionally, substantial performance implies somewhat less than complete compliance. While I agree that the Board's finding that TDC made substantial progress towards creating a program necessarily subsumes a finding that much of the information in the progress reports was accurate, it certainly cannot be read to validate the progress reports' *total* accuracy.[1]

Moreover, to the extent that the Board did make implicit findings as to the reports' veracity, it can fairly be said to have done so only with respect to statements summarizing

---

1. Indeed, the Board affirmatively concluded that TDC had misrepresented its own financial stake in the progress reports but did not find this fatal to TDC's cause. Obviously, then, the Board's legal conclusions did not rest on the reports' absolute accuracy.

TDC's efforts. Because TDC's obligation was to exercise its best efforts, "UMTA's breach of contract claim turned on whether TDC made a good faith effort to produce an operational program, not on whether those efforts proved successful." Majority opinion at 296. There is a qualitative difference between statements describing TDC's efforts and statements reporting the success of those efforts (which in turn tend to predict the conduct of third parties). Most of the statements challenged by the United States in its False Claims Act suit fall into this second category. Thus, for example, the United States contests the veracity of TDC's statements that it anticipated that Equitable Life would shortly reach a decision on whether or not to participate as an investor in the bonding program, *see* Plaintiff's Complaint at 6 (¶ 21); that a representative of Equitable Life had indicated the proposal would shortly go to the investment committee for approval, *see id.* at 7 (¶ 24); and that New York Life and Equitable Life would likely sign a contract within thirty days, *see id.* at 9–10 (¶¶ 31–32). The underlying accuracy of these statements seems to me irrelevant—or at the very least, not "essential to the judgment" of a Board charged with assessing TDC's best efforts. RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1982) ("[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, *and the determination is essential to the judgment,* the determination is conclusive in a subsequent action between the parties") (emphasis added).

At bottom, this case presents confusion born of a statutory scheme that requires related claims to be tried in different fora. The jurisdiction of the Board, established by the Contract Disputes Act of 1978, 41 U.S.C. § 601 *et seq.,* does not extend to claims involving fraud. Nonetheless, as in this case, litigants frequently have a fraud claim in their quiver of defenses to a contract dispute. Certainly, the Board must occasionally find facts or draw conclusions on issues within its statutory domain that affect subsequent fraud suits. That some issue preclusion may be inevitable, however, does not mean we should presume it lightly. In this case, all the parties proceeded from the outset aware of the possibility that their actions could have

consequences in subsequent proceedings. Absent some stronger showing that the Board, cognizant of the potential for issue preclusion, actually considered or decided issues pertaining to the False Claims complaint adversely to the United States, I cannot see any reason to blur the lines unnecessarily between the Board's and our jurisdiction. Accordingly, I respectfully dissent.