61 F.3d 909
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Janet M. COVINGTON; Stanley H. Sidicane, Plaintiffs-Appellants,
United States of America, Plaintiff-Appellee,
v.
SISTERS OF the THIRD ORDER OF ST. DOMINIC OF HANFORD,
CALIFORNIA, d/b/a Sacred Heart Hospital, et al., Defendants.
 No. 93-15194.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted March 15, 1994.
Decided July 13, 1995.
 
 Appeal from the United States District Court for the Eastern District of California, No. CV-87-00632-OWW; Oliver W. Wanger, District Judge, Presiding.
 E.D.Cal.
 REVERSED AND REMANDED.
 
 
 1
 Before: D.W. NELSON and BEEZER, Circuit Judges, and LETTS,* District Judge.
 
 
 2
 MEMORANDUM**
 
 
 3
 Relators Janet Covington and Stanley Sidicane ("the Relators") brought this action as qui tam plaintiffs pursuant to the False Claims Act, 31 U.S.C. Sec. 3729-3731. On December 10, 1992, the district court entered a final order that effectively granted judgment to the United States and terminated the proceedings. The Relators appeal, seeking either our determination that they were entitled to participate in the settlement or a remand to the district court with instructions to resolve the dispute on its merits. We have jurisdiction pursuant to 28 U.S.C. Sec. 1291. We agree with the Relators that resolution of this dispute on the merits is necessary. We reverse and remand.
 
 
 4
 * In November 1987, the Relators filed a qui tam complaint on behalf of themselves and the United States government, pursuant to the False Claims Act ("the Act"), 31 U.S.C. Sec. 3730. The complaint alleged that Sacred Heart Hospital, a private hospital in Hanford, California, the Catholic Health Corporation, and others (collectively "Sacred Heart") had violated the Act in connection with their participation in the federal Medicare program. The Relators alleged two types of wrongdoing. First, they claimed that Sacred Heart personnel had fraudulently recoded diagnoses to receive higher reimbursement from the fiscal intermediary. This "upcoding" claim is not at issue in this appeal. Second, the Relators asserted that Sacred Heart personnel knowingly submitted false claims for Medicare payments based on an inflated reimbursement rate. This "overpayment" claim is at issue here.
 
 
 5
 The overpayments began in January 1984 when auditors for Blue Cross of California, the fiscal administrators of the Medicare program in the state, applied an incorrect geographical factor to compute Medicare reimbursements to Sacred Heart for medical services that the hospital had rendered. Although Sacred Heart is a rural hospital located in Kings County, California, it received payments as though it were an urban hospital located in Alameda County, California. The urban factor resulted in a higher rate of reimbursement than the rate to which Sacred Heart was entitled. The Relators' complaint alleged that Sacred Heart personnel knew of the incorrect overpayments for several years, yet continued to accept and use the payments.
 
 
 6
 After investigation and negotiations, during which discovery by the Relators was not permitted, the government settled both claims. Early in 1988, the government required Sacred Heart to make restitution on the overpayment claim through an Administrative Settlement, under which Blue Cross would withhold a portion of Sacred Heart's future Medicare reimbursements until the entire amount, approximately $2.6 million, had been repaid. The Relators asserted a right under the Act, see 31 U.S.C. Sec. 3730(f), to a percentage of the government's recovery, but the government asserted that the Relators were not entitled to any share in that recovery because the government had accepted simple restitution for the overpayment amount after concluding that Sacred Heart's conduct was not fraudulent.
 
 
 7
 The Relators continued to assert their entitlement to a portion of the recovery for the overpayment violations as part of the negotiations for settlement of the upcoding violations. In January 1991, the Relators, Sacred Heart, and the government reached a Settlement Agreement ("the Agreement") by which the Relators would receive a portion (twenty percent plus interest) of the upcoding recovery. The Agreement also provided that the Relators' claim to a portion of the Administrative Settlement of the overpayment claim would be resolved through an expedited mechanism: the issue would be presented via "motion and stipulated facts with no discovery permitted." If the parties were unable to agree on undisputed facts, "the parties [were to] thereafter proceed as if a motion for summary judgment had been filed under the provisions of the [Federal Rules of Civil Procedure]." The government agreed to provide all relevant documents, except those subject to a protective privilege. Pursuant to the Agreement, the district court dismissed all claims except the participation of the Relators in the overpayment recovery that is the subject of this appeal.
 
 
 8
 The government provided copies of five letters exchanged between Sacred Heart and Blue Cross from late January 1987 through December 1987, which initially stated that the hospital reimbursements were at "inappropriate" rates. The government withheld its own investigative reports and interview records with Sacred Heart personnel. Because the government claimed privilege for these crucial discovery documents, the Relators moved for a discovery order. The district court determined that the asserted privileges were inapplicable and ordered production.
 
 
 9
 Based on those documents, the government and the Relators prepared a statement of admitted facts to be submitted in support of the summary judgment motion. Each side also submitted additional facts. Attached to its opposition, the government submitted the declarations of Wallace Flemming, Sacred Heart's Chief Executive Officer during the period of the overpayments, and Norman Siegal, the government investigator who claims to have prepared the final administrative report on the overpayment claim. The government also submitted excerpts from a January 1989 deposition of Mario Rocha, the hospital's Chief Financial Officer during the period of the overpayments.
 
 
 10
 The following facts are uncontested. Sacred Heart learned about the overpayments as early as June 1984 when, according to Rocha's deposition, Flemming informed Rocha that he had contacted Blue Cross, the fiscal administrator, to tell them that the reimbursement rate was inappropriate. Blue Cross told Flemming that the rate was correct, and that "Flemming was wrong about any mispayment." Flemming contacted a law firm in 1986, and the firm advised Flemming to send a letter to Blue Cross. Meanwhile, Rocha established a line item in Sacred Heart's budget to track the estimated overpayments as a "liability to third parties" for accounting purposes. Rocha was not sure of the cause of the overpayment, but he suspected a mistake in the urban-rural coding.
 
 
 11
 On January 26, 1987, Flemming made the hospital's first written inquiry to Blue Cross. Four more letters were exchanged during 1987 between Sacred Heart and Blue Cross regarding the incorrect payment rate. On November 5, 1987, the Relators filed their qui tam complaint under seal, and in early December the government began an investigation of Sacred Heart. On December 22, 1987, Sacred Heart again informed Blue Cross that the rate was incorrect, this time specifying that it had resulted in inflated payments.
 
 
 12
 The parties were unable to stipulate to further facts, but each contended that there were no genuine issues of material fact and submitted a statement of their versions of the facts. The Relators moved for summary judgment, and the government filed an opposition that was treated as a motion for summary judgment pursuant to the Scheduling Conference Order.
 
 
 13
 After briefing and oral argument, the district court determined that there were genuine issues of material fact because the facts did "not establish the extent of the knowledge of the Hospital, [or] whether knowingly false claims were being submitted to the U.S. Government." The district court thus concluded that it could not grant summary judgment for either party.
 
 
 14
 After requesting supplemental briefing regarding what further action would be appropriate under the Agreement, the court interpreted the Agreement to constitute a waiver of the Relators' right to proceed to trial for determination of the issue, because it concluded that the parties intended the Relators to receive compensation only if judgment as a matter of law could be entered in their favor on the basis of the summary judgment motion. The court issued an order concluding the case, effectively absolving the United States from any obligation to share any portion of the Administrative Settlement recovery with the Relators. An appeal of this order by Relators contests the district court's interpretation and enforcement of the terms of the Agreement.
 
 II
 
 15
 To the extent that the district court's order is considered a denial of summary judgment to the Relators and a grant of summary judgment to the United States, it is reviewed de novo. Jesinger v. Nevada Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir. 1994). We also review questions of law and interpretations of a statute de novo. United States ex rel. Madden v. General Dynamics Corp., 4 F.3d 827, 830 (9th Cir. 1993).
 
 III
 
 16
 We must first address whether the district court applied the correct standard of liability to Sacred Heart's conduct. The False Claims Act provides that a party who "knowingly" submits false or fraudulent claims to the government is subject to liability. 31 U.S.C. Sec. 3729(a). Whether Sacred Heart personnel caused the improper rate calculation is immaterial because the mere receipt and deposit of government funds known to have been paid by mistake is a false claim under the Act. United States v. McLeod, 721 F.2d 282, 283 (9th Cir. 1983). Liability for Sacred Heart thus depends on whether they knew that they were receiving overpayments to which they were not entitled.[1]
 
 
 17
 The district court held that there was a genuine issue of material fact regarding whether Sacred Heart personnel satisfied the "knowing" state of mind requirement under the Act. Without discussing the standard that it was applying, the district court apparently considered it necessary for the Relators to establish actual knowledge or fraud. The Relators consistently countered that the hospital should be liable for its conduct under the constructive knowledge liability standard.
 
 
 18
 The statute, as clarified by Congress in the False Claims Amendments Act of 1986, explicitly states that deliberate ignorance or reckless disregard for the truth satisfies the "knowingly" state of mind requirement of the Act. See Pub. L. No. 99-562, Sec. 2(7), 100 Stat. 3153 (effective Oct. 27, 1986), codified at 31 U.S.C. Sec. 3729(b); see also United States ex rel. McCoy v. California Medical Review, Inc., 723 F. Supp. 1363, 1370 (N.D. Cal. 1989) (noting that Congress "merely clarified what had been the proper standard under the old Act."). "The Committee's amendments ... [were] aimed at correcting restrictive interpretations of the act's liability standard." S. Rep. No. 345 at 4, 99th Cong., 2d Sess., reprinted in 1986 U.S.C.C.A.N. 5266, 5269. Congress explained that the "gross negligence" standard is based on a "constructive knowledge definition [that] attempts to reach what has become known as the 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple inquiries which would alert him that false claims are being submitted." Id. at 5285.
 
 
 19
 The Relators' claim was filed after the October 1986 effective date of the 1986 amendments, but the claim covers conduct that occurred both before and after that date. The earlier conduct comes within the 1986 amendments if "the nature of the [offense] involved is such that Congress must assuredly have intended that it be treated as a continuing one." Toussie v. United States, 397 U.S. 112, 115 (1970). We conclude that Sacred Heart's conduct in accepting the overpayments, if it is proven to be reckless or deliberately ignorant, constitutes a continuing offense under the False Claims Act. Cf. United States v. Morales, 11 F.3d 915, 917-18 (9th Cir. 1993) (concluding that a bribery scheme that began before the Sentencing Guidelines went into effect and extended beyond that date constituted a continuing offense to which Guidelines provisions applied); United States v. Gray, 876 F.2d 1411, 1418 (9th Cir. 1989) (concluding that failure to appear for sentencing was a continuing offense).
 
 
 20
 Sacred Heart began receiving overpayments in 1984 and continued to accept overpayments for more than one year after passage of the amendments, until December 22, 1987. The acceptance of the overpayments constitutes a continuing offense for which the prospective application of the liability standard as articulated in the 1986 amendments is appropriate.
 
 
 21
 Because the district court applied the incorrect standard, we must consider whether the Relators are entitled to summary judgment based on the constructive knowledge state of mind. We conclude that they are not. Examining the same evidence submitted to the district court in the light most favorable to the United States, we are unable to determine as a matter of law that Sacred Heart acted with deliberate ignorance or with reckless disregard for the truth.
 
 
 22
 Although the Relators have presented evidence that tends to show that hospital personnel knew they were receiving overpayments from Blue Cross and failed to take sufficient action, that evidence is not undisputed. Flemming's efforts to inform Blue Cross of the error as early as 1984, Rocha's keeping track of the improper payments, and the flurry of letters sent in 1987 all support the United States' argument that Sacred Heart did not act with reckless disregard for the truth. Although the Relators do not dispute the fact that each of these actions occurred, they dispute whether the hospital did all that it could to deal with the overpayments. That determination would involve fact-based interpretations of all the events, a process that is not appropriate in deciding a motion for summary judgment.
 
 
 23
 In addition to the disputed evidence in the record, we also are concerned by important evidence that is not in the record. We do not know how extensive the overpayments were compared to the hospital's total budget. If the overpayments were substantial, Sacred Heart personnel should perhaps have taken dramatic action quickly. If the overpayments were relatively steady but small, the actions of Flemming and Rocha might well have been all that one would expect. Because the record is silent, we cannot conclude as a matter of law that Sacred Heart personnel acted knowingly, recklessly or with deliberate ignorance in accepting the overpayments.
 
 IV
 
 24
 We must next determine whether the district court properly granted judgment in favor of the United States. The Relators argue that the district court erred in interpreting the Settlement Agreement to preclude further consideration of their claim on the merits. We agree.
 
 
 25
 A settlement agreement is interpreted by reference to the same principles applied to any other contract.[2] United Commercial Ins. v. Paymaster Corp., 962 F.2d 853, 856 (9th Cir. 1992); General Motors Corp. v. Superior Court, 15 Cal. Rptr. 2d 622, 625 (Cal. Ct. App. 1993). Our objective in construing contract language is to "determine and to effectuate the intention of the parties." Winet v. Price, 6 Cal. Rptr. 2d 554, 558 (Cal. Ct. App. 1994); see 4 Samuel Williston, Williston on Contracts Sec. 600 (1961) ("[T]he guiding principle, polestar or lodestar of interpretation, whatever the form or nature of the instrument is always the same: To ascertain the will, or intent, of the [parties]."); 3 Arthur L. Corbin, Corbin on Contracts Sec. 536, 538 (1960).
 
 
 26
 The Settlement Agreement between the government and the Relators provided that the parties would have "the right to contest before the Court" whether the Relators were entitled to a share of the settlement of the overpayment claims. The Agreement set up a mechanism under which the parties agreed to present a set of stipulated facts to the district court. If the parties disagreed with factual assertions made by either party, each party would present "alleged undisputed facts" to the court. The parties were then to proceed "as if a motion for summary judgment had been filed under the provisions of the [Federal Rules of Civil Procedure]."
 
 
 27
 Having concluded that summary judgment could not be granted to the Relators, the district court then interpreted the Agreement's silence on any further course of action as an indication that the parties intended no further course of action. Then the court granted judgment for the United States.
 
 
 28
 In our opinion, such an interpretation of the Settlement Agreement goes beyond the words of the agreement, and contravenes the intentions of the parties. The Agreement contemplates that the issue of the Relators' right to share in the overpayment settlement would be treated as a motion for summary judgement. See Fed. R. Civ. P. 56. When a summary judgment motion is denied, a trial is required to resolve genuine issues of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); cf. Fed. R. Civ. P. 56(c), (d) ("[i]f on motion under this rule judgment is not rendered upon the whole case ... and a trial is necessary."). We are unwilling to cut off the traditional resolution of factual disputes through some type of trial in the absence of clear indication that the parties did not necessarily desire to resolve the dispute on the merits. See 10 Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure Sec. 2712 (1969) ("[D]enial of summary judgment is not a decision on the merits; it simply is a decision that there is a material factual issue to be tried.").
 
 
 29
 Although the Settlement Agreement contains general language indicating that the parties wished to avoid litigation, we are not convinced that this language means that the parties agreed that the United States would prevail if the Relators could not obtain summary judgment. That is unquestionably the result under the district court's reading of the Agreement. Such a result is grossly unfair to the Relators, and we discern no reason to attribute such an intention to their Agreement. Indeed, the Agreement indicates that the parties wished to "resolve all issues and disputes between" them. Thus, while the parties wanted to minimize litigation to the extent possible, they did not expressly preclude further proceedings if their efforts at an expedited resolution failed.
 
 
 30
 We conclude that, absent a specific provision in the agreement indicating that the parties intended summary judgment to be the final stage, we will follow the course set by the Federal Rules of Civil Procedure. Because we have declined to decide the issues in this case as a matter of law, we remand so that they may be resolved by a factfinder at trial. See Fed. R. Civ. P. 37, 38.
 
 
 31
 REVERSED and REMANDED.
 
 
 32
 D. W. NELSON, concurring in part, dissenting in part, and concurring in the decision to remand:
 
 
 33
 I concur in Parts I, II, IV, and in the portion of Part III which concludes that the 1986 amendments to the False Claims Act apply to require a gross negligence standard of liability. I dissent from the remainder of Part III, for the reasons outlined herein.
 
 
 34
 The majority omits key portions of the factual record such as statements by the hospital defendants and crucial information contained in the government's own investigative reports and thus presents an incomplete perspective on the hospital's actions. In addition, the majority's description of the hospital's communications with Blue Cross may be misleading without the details presented here.
 
 
 35
 The facts show that the hospital administrators knew from the beginning that the hospital was receiving overpayments and were at least reasonably certain that there was an urban coding error. Flemming's 1984 call merely stated that his rate calculations did not conform to the fiscal intermediary's. Neither Flemming nor Rocha claim that Flemming alerted Blue Cross that the hospital was receiving overpayments. Yet in 1984, they both knew that the hospital was receiving overpayments, and Rocha's deposition states that he knew that the overpayments were due to an urban-rural coding error. Rocha's interview with the government investigators indicates that he was reasonably certain about the urban coding error but could not exactly duplicate the figures. He was able to duplicate the figures exactly in March 1987 after Blue Cross sent a sample calculation showing that it was applying the specific rate for Oakland, Alameda County.
 
 
 36
 In spite of knowledge of the overpayments, the hospital did not set the funds aside in escrow: it continued to receive, use, and earn interest on the overpayments throughout the period from January 1984 to December 14, 1987. Rocha's deposition indicates that, even though Flemming and Rocha considered the overpayment to be so significant that it would be discovered in the first external audit, they did nothing further to inform Blue Cross when it was not. Even the Catholic Health Corporation knew that the hospital was receiving overpayments based on an urban coding at least as early as September 1986, as indicated by a September 1986 letter to the hospital from Catholic Health Corporation vice president Kroll. The overpayments were also discussed by the hospital board in late 1986, as indicated in the minutes of a December 1986 board meeting and in the Moeller deposition.
 
 
 37
 Flemming's January 1987 letter, which was the first written inquiry regarding the rate problem, merely reiterated the 1984 concern regarding rate calculations without stating that the hospital had received significant overpayments. In early 1986, however, Flemming had been advised by the hospital's own accountants and attorneys that the overpayment amount was significant and that he should inform Blue Cross of the problem by letter. (The overpayment amount was between one-half and three-quarters of a million dollars a year.) Although Blue Cross responded on March 19, 1987 with a sample of its calculation with the Oakland, Alameda County coding error and asked the hospital to respond with a sample of its own calculations if the hospital was still unable to duplicate the calculation, the hospital did not respond until almost seven months later, on October 6, 1987. Even then, the hospital's letter failed to include a sample of its own calculations and failed to inform Blue Cross that it was receiving overpayments or that the overpayments were attributable to an urban coding error.
 
 
 38
 The hospital wrote to Blue Cross in December 1987 informing it for the first time that the rate error resulted in overpayments. However, this letter was not sent until several months after Blue Cross had written again, on October 16, 1987, that it could not provide further assistance to the hospital's attempt to duplicate the federal rate calculations without a sample of the hospital's actual calculations to review. The hospital's letter was also dated several weeks after the qui tam investigation had allowed Blue Cross to correct the coding error.
 
 
 39
 The government's own final investigative report on the overpayment claim concluded that "the hospital failed to properly disclose" the overpayment and that the hospital administrator had "concealed the proper information from the fiscal intermediary." Although the author of the report submitted a declaration in 1992 that clarifies that he found no evidence of "provable fraud," "affirmative false statements," or "inten[t] to defraud" and that the investigation had concluded that the overpayments did "not involv[e] fraud,"[1] he confirmed his conclusion "that the hospital could have been more forthcoming and candid about the discrepancy with Blue Cross. I reached this conclusion because Mr. Flemming's letters to Blue Cross go only so far as to advise that his calculations of the payment rate were different than the fiscal intermediary's."
 
 
 40
 The district court found that the hospital knew that it was receiving overpayments, but it still characterized the facts as presenting a dispute regarding whether the hospital actually knew that the overpayments resulted from false information. Because the court applied an actual knowledge or fraud liability standard, it concluded that affirmative actions of concealment were required for liability.[2] The court therefore found that Flemming's minimal inquiries in his 1984 phone call and 1987 letter regarding the method of calculating reimbursement rates and Rocha's tracking of the liability in a preexisting general ledger account for liabilities due third parties[3] were sufficient to create a genuine issue of fact. The court also mistakenly concluded that there was evidence that Flemming had attempted to inform Blue Cross about overpayments[4] and that the hospital was not certain of the source of the problem (the urban-rural error) until it received Blue Cross' March 1987 sample calculation. The court, applying the incorrect actual knowledge or fraud standard, thus refused to grant summary judgment to the relators because of a factual dispute regarding whether the hospital defendants committed actual fraud by affirmatively concealing the urban-rural coding error and resulting overpayments.
 
 
 41
 The factual issues that create a dispute regarding actual fraud are not sufficient to create a dispute regarding the much lower liability standard of "gross negligence" required under the act. See, e.g., S. Rep. No. 345, 99th Cong., 2d Sess., reprinted in 1986 U.S.C.C.A.N. 5266, 5285 (explaining that the "gross negligence" standard "attempts to reach what has become known as the 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple inquiries which would alert him that false claims are being submitted"). I disagree with the majority's view that the determination of whether the hospital "did all that it could to deal with the overpayments" "involve[s] fact-based interpretations of all the events" that preclude a finding of summary judgment for the relators. The hospital defendants did not commit an "innocent mistake," nor was their conduct simply careless and thus "mere negligence." Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1421 (9th Cir. 1991). The facts are sufficient to show that they knowingly refrained from advising their fiscal intermediary of significant overpayments from the beginning of 1984. See United States v. TDC Management Corp., 24 F.3d 292, 298 (D.C. Cir. 1994) (finding that actual knowledge, reckless disregard, or deliberate ignorance that the corporation had omitted material information from a report to the government was a violation of the act). Even after all principal parties were not just reasonably certain but absolutely sure that the source of the overpayments was an urban coding error, they refrained from informing Blue Cross and continued to benefit from the windfall funding that accrued due to the error. This behavior clearly satisfies the gross negligence standard of deliberate indifference to the truth.
 
 
 42
 I respectfully dissent from Part III's determination that the undisputed facts are insufficient to support summary judgment for the Relators. Because I agree that the Settlement Agreement should be interpreted to require resolution of disputed facts at trial, however, I concur in the remand.
 
 LETTS, concurring in part, dissenting in part:
 
 43
 I concur in Parts I, II, and III and dissent from Part IV. I believe that the district court properly interpreted the Settlement Agreement to preclude further consideration of the Relators' claim on the merits and I would affirm the district court's granting judgment in favor of the United States.
 
 
 44
 The Settlement Agreement limited the dispute before the district court to whether the Relators were entitled to participate in the Administrative Settlement. The stated intent of the parties was to settle the action without litigation. Settlement Agreement at paragraphs 3, 8. The dispute was to be resolved "via motion and stipulated facts with no discovery permitted," or if facts were disputed, by receiving the parties' separate sets of "alleged undisputed facts" and by proceeding "as if a motion for summary judgment had been filed under the provisions of the [Federal Rules of Civil Procedure]." Settlement Agreement at paragraphs 6(B) and (C).
 
 
 45
 The Settlement Agreement states that "should the Court find that the Sidicanes are entitled to share in said proceeds, the Sidicanes shall be awarded 15% of the amount of the [Administrative Settlement]." Settlement Agreement at p 6(C) (emphasis added). It is clear that the Relators would benefit from the Administrative Settlement if they affirmatively proved that Sacred Heart had violated Sec. 3729 as a matter of law based on the undisputed facts--that is, if the Relators prevailed on summary judgment. As discussed in Part III of the majority opinion, the Relators could not prevail on summary judgment even under the "deliberate ignorance" or "reckless disregard" standard.
 
 
 46
 The Settlement Agreement is silent about what happens upon a denial of plaintiff's or defendant's motions for summary judgment.[1] The majority in Part IV concludes that the logical step following the denial of the summary judgment motions is to resolve the disputed factual issues at trial. I believe, however, that the reference in the Settlement Agreement to the Federal Rules simply was intended to govern how the matter would be put to the district court for decision, not to commit the court to further proceedings in the event facts were found to be in dispute.
 
 
 47
 Allowing a trial of the disputed facts would contradict directly the overriding intent of the parties to avoid further discovery and litigation. The parties stated their intent that the Settlement Agreement "would settle, compromise, and resolve all issues and disputes between them based on the above claims in order to avoid the uncertainty and expenses of litigation." Settlement Agreement at p 3. The parties further agreed that:
 
 
 48
 this Settlement Agreement shall be complete and shall not be subject to any claim or [sic] mistake of fact or law by any of them, and that it expresses a full and complete settlement of liability claimed and denied, as against all of the parties hereto and, regardless of the adequacy or inadequacy of the amount paid, this Settlement Agreement is intended to avoid litigation and to be final and complete.
 
 
 49
 Settlement Agreement at p 8. The trial court found that the plaintiffs reaffirmed this intent in their Scheduling Report filed December 30, 1991: "Pursuant to the parties' stipulation, the case is to be concluded by summary judgment (emphasis added) ...." Scheduling Report at p 7, quoted in Memorandum Opinion re Final Relief After Denial of Parties' Cross-Motions for Summary Judgment, Dec. 2, 1992, at 5.
 
 
 50
 In the context of these statements, I believe the district court properly interpreted the Settlement Agreement to terminate any further proceedings if the Relators were unable to prevail on summary judgment. The fact that the district court considered an additional declaration by the government agent who drafted the government's investigative report on the overpayment claim in the determination of the summary judgment motion does not defeat the parties' intent. It appears that the district court reopened the record for the limited purpose of assuring itself that a fact apparently in dispute was actually disputed, rather than to resolve a disputed fact. Having determined that disputed issues of fact remained that precluded granting the Relators' motion for summary judgment, the district court correctly concluded that the United States was entitled to a final judgment.
 
 
 
 *
 The Honorable J. Spencer Letts, United States District Judge for the Central District of California, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or used by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 We reject the United States' argument that the Relators could not recover because the government accepted a restitution payment as a recovery. This argument would allow the government to eliminate recovery for relators by simply characterizing the nature of the conduct
 
 
 [2]
 The parties dispute which law applies to the interpretation of the Agreement. The Relators assert that California law applies, while the United States contends that federal law applies. While we are inclined to agree with the United States, see Kennewick Irrigation Dist. v. United States, 880 F.2d 1018, 1032 (9th Cir. 1989), we need not conclusively resolve this issue. Under both California law and federal law, we look to general principles of contract law. Id
 
 
 [1]
 Although the government had argued that the gross negligence standard was applicable in a related case involving the insurers that was heard before Judge Price (who also approved the settlement agreement) before the case was transferred to Judge Wanger (who interpreted the settlement agreement), the government based its claim before Judge Wanger and before this court on a requirement of actual fraud
 
 
 [2]
 The district court expressed the standard as follows:
 [I]f overpayments resulted from concealment of known facts which are false, i.e., Hospital officers knew that the Hospital was a rural, not an urban hospital, who nonetheless knowingly kept the overpayment, a false claim is established."
 CR 104: 16 (emphasis added).
 
 
 [3]
 There is a strong argument that establishing this "paper" method of accounting for the excess funds provided a means of concealment for the overpayments in the audit process while at the same time protecting the hospital from charges of actual fraud in the eventuality that the geographic rate error were discovered by the auditors. Without accounting for the liability in this way, the hospital would have had to change its internal documents regarding the rate calculation to show the urban rate, which clearly would have involved actual fraud
 
 
 [4]
 The district court's opinion states:
 Mr. Fleming's [sic] efforts to draw the issue of overpayment to the attention of Blue Cross and the establishment of a fund for repayment is direct evidence of non-fraudulent conduct as to the disputed Medicare reimbursement.
 CR 104: 14 (emphases added).
 
 
 [1]
 I understand the district court's invitation of cross motions for summary judgment to have been a procedural means for implementing the bargain, not an indication of some different bargain